## Ardell RICKETTS *v.* STATE of Arkansas

5810                                        494 S.W. 2d 462

Opinion delivered May 7, 1973
[Rehearing denied June 11, 1973.]

*Bob Scott* and *Robert D. Smith III,* for appellant.

*Jim Guy Tucker,* Atty. Gen., by: *O. H. Hargraves,* Asst. Atty. Gen., for appellee.

J. Fred Jones, Justice. Ardell Ricketts was charged with murder in the first degree for the killing of Ward Phillips. He was convicted at a jury trial of murder in the second degree and was sentenced to the penitentiary

for a term of five years. The errors he assigns on this appeal are hereafter discussed but first we relate some of the background leading to the difficulty between Ricketts and Phillips.

Ricketts maintained a campsite on the Buffalo River near his home in Newton County about 18 miles down river from Jasper. Ward Phillips used and maintained a campsite formerly owned by his family on the river some distance down stream from Rickett's campsite and a few hundred yards up stream from a low water bridge across the river. On June 8, 1972, Ricketts' wife and young daughters together with his sister and brother-in-law, Mr. and Mrs. Ralph Wallen, and their children were occupying the Ricketts campsite.

Bill Houston and Mr. Phillips worked together in conducting float trips down the Buffalo River. Mr. Houston furnished the boats and guides and Mr. Phillips furnished sleeping facilities and prepared campsites and meals at the end of the day's trip. A Mr. Allen Johnson and his friend, Earlie Woods, lived in Missouri and they made arrangements with Houston and Phillips for a fishing float trip on the Buffalo River. They met Houston and Phillips in Jasper and on June 8 started what was to have been a two day float down the river in one of Houston's boats operated by Houston's employee. In the meantime Phillips drove overland to his campsite with his pickup truck and camper trailer in order to have the campsite prepared for Johnson and Woods at the end of their first day's float down the river.

The Phillips campsite was protected by a gate across the road leading down into the campsite, and the gate was kept locked with a padlock and chain. Mr. Phillips parked his pickup truck with the attached camper trailer inside his camp area some distance from the gate. He arranged to sleep in the "hull" on the back of his pickup and had arranged for Johnson and Woods to sleep in the camper he pulled behind the pickup. When Johnson and Woods arrived at the campsite late in the afternoon on June 8, Mr. Houston was there for the purpose of taking his employee home. After cleaning some fish Johnson and Woods had caught, Mr. Houston left with the intention of returning early the next morning with

another boat to continue the float trip down river from the low water bridge below the campsite. After Houston and his employee had gone, Johnson and Woods desired a bath and fresh clothes so they, as well as Mr. Phillips, went bathing in the river adjacent to the campsite at the lower end of a long hole of water, which was also more or less a popular swimming place used by the public. After taking a bath in the river and eating the evening meal Phillips had prepared, they all three retired for the night in their respective sleeping quarters.

In the meantime at the Ricketts' campsite, Ricketts' wife and sister and their young daughters had been boat riding on the river in the afternoon of June 8, and Mr. Ricketts had been on a business trip to Kansas City, Missouri. When Ricketts arrived at his campsite about 10 o'clock that night, someone in his group told him that they had paddled their boat down the river that afternoon and saw three men swimming nude adjacent to the Phillips campsite; that upon seeing their boat one of the men remarked that it was a boatload of "damn women," and one of the men then left the water totally nude and stood on the sandbar and dried himself with a towel.

Mr. Ricketts drove his automobile to the Phillips campsite and after sounding the automobile horn for a short period of time at the gate, he drove on to his home about six miles away where he exchanged the automobile for a truck and obtained a .30-.30 rifle and a .22 caliber pistol. He then returned to the Phillips campsite where he harassed and intimidated the occupants the remainder of the night. When Mr. Phillips finally attempted to leave his campsite early on the morning of June 9, Mr. Ricketts followed him and killed him with the .22 caliber pistol. The facts are more specifically set out herein from the evidence discussed under the assignments of error.

The appellant first contends there was no substantial evidence to sustain the conviction and argues that there was no malice proven. We do not agree. Murder is defined as the unlawful killing of a human being, in the peace of the State, with malice aforethought, either express or implied. Ark. Stat. Ann. § 41-2201 (Repl. 1964). Malice is implied by statute when no considerable provocation

appears, or when all the circumstances of the killing manifest an abandoned and wicked disposition. Ark. Stat. Ann. § 41-2204 (Repl. 1964). Certainly the evidence in this case fits at least the statutory definition of *implied* malice.

According to the testimony of Mr. Johnson and Mr. Woods, after they and Mr. Phillips retired about 9 or 10 o'clock on the night of June 8 they were awakened about midnight by an automobile horn blowing near the camp. They saw the rear of the automobile as it left their campsite and assumed it was occupied by teenagers. A short time later they were awakened again by a truck's headlights flooding the campsite and a horn blowing. The truck was parked at the closed campsite gate and its horn was blowing constantly. A man, later identified as Ricketts, was standing outside his truck cursing and firing weapons and demanding that Mr. Phillips come to the gate and talk with him. While Johnson and Woods were getting dressed, Mr. Phillips made various excuses for not going to the gate. Ricketts then threatened to fire his rifle through the camper trailer if Mr. Phillips did not come up to the gate and talk with him. Ricketts demanded that Phillips come to the gate unarmed and, according to Johnson and Woods, he told Mr. Phillips he would get hurt if he came to the gate armed. Mr. Phillips handed Johnson and Woods a flashlight and shouted to Ricketts that he could not come to the gate because he was barefoot. He warned Ricketts that he might injure a woman if he shot through the camper trailer and suggested that Ricketts come to where Phillips was if he wanted to talk with him. As Ricketts approached the trailer camper carrying his rifle, Johnson and Woods slipped out of the camper and hid in the woods between the campsite and the river until daylight. According to Johnson and Woods, Mr. Ricketts remained at the Phillips' campsite the remainder of the night after they hid in the woods and the horn on the truck continued to blow until it appeared to die out because of a depleted battery.

Mr. Houston returned to the campsite just after daylight as he had agreed the previous day in order to continue the float trip. From where they were hiding Johnson and Woods saw Mr. Houston drive across the

low water bridge where he turned around and started back across the bridge. Mr. Ricketts also drove his truck across the bridge and stopped and talked with Houston. He then drove across the bridge and also turned around and drove back toward the campsite. After hearing a truck leave the campsite, Johnson and Woods slipped back in sight of the area and found that Mr. Phillips' truck and camper trailer as well as Ricketts' truck were gone. Johnson and Woods then caught a ride with a Mr. Waters who was crossing the low water bridge on his way to work in Jasper. They rode with him back past the Phillips' campsite and when they had traveled about a mile from the bridge, they came upon Mr. Phillips' vehicles stopped on the side of the road and found Mr. Phillips lying on the ground beside his truck shot through the chest. Mr. Phillips was still alive and conscious and told them that Mr. Ricketts shot him. They placed Mr. Phillips in Waters' pickup truck but he died before they arrived in Jasper. A .22 caliber bullet fell from Mr. Phillips' clothing as he moved about in the bed of Waters' pickup and the bullet was later identified by a ballistics expert as having been fired from Ricketts' pistol.

On cross-examination Johnson and Woods denied swimming in the nude but stated that they as well as Mr. Phillips had their undershorts on while they were bathing in the river. They denied that any of them made any remark concerning the women in the boat. They said they did see a boat with some people in it turn around at the upper end of the long hole of water where they were bathing, but that the boat was so far from them they could not tell who was in it. They said someone did remark that they would stay in the water above their waists if the boat should come on down the river.

Mr. Bill Houston testified that when he returned to Mr. Phillips' campsite around 6 o'clock on the morning of June 9 to continue the float trip down the river, Mr. Ricketts was at the campsite with Phillips and that Ricketts' truck was parked at the gate entrance to the camp. He said that as soon as he parked his own truck at the gate, Mr. Phillips came toward the gate and told him not to say anything to Mr. Ricketts about Johnson and Woods being down there. He said Mr. Phillips then

disposed of some garbage in a ditch, and went back toward the trailer. He said that Mr. Ricketts then came up from Mr. Phillips' camp to the gate and insisted that he put his boat into the water there at Mr. Phillips' camp instead of putting it in below the low water bridge. He said that Ricketts was armed with a pistol in a holster on his belt and that he aimed the pistol at the lock on the gate several times but did not fire it. He said that Ricketts then attempted to beat and pry the lock off the gate with a tire tool. He said Mr. Phillips came back up to the gate and told Ricketts there was no point in beating the lock off the gate and offered Ricketts a key to the lock. He said Ricketts did not accept the key but pushed Mr. Phillips aside and that Mr. Phillips walked back down to his camp and he did not see Mr. Phillips again. Houston said that Ricketts then asked him to help get his (Ricketts) truck started. He said Ricketts told him the truck battery was down because he had left the lights on and the horn blowing. He said he asked Mr. Ricketts why he left the lights on and the horn blowing and Ricketts said: "I wanted the son of bitches to shoot my lights out." Houston said that Ricketts remarked something about these men didn't have any respect for his wife and children and that he had a 13 year old daughter. He said Ricketts didn't appear to be drunk but did appear to be angry. He said that after he helped Ricketts get his truck started, Ricketts backed his truck through the gate and knocked it open. He said that he drove his own truck down to and across the low water bridge looking for Johnson and Woods and that as he returned, he met Mr. Ricketts in his truck and they sat and talked for a few minutes with their vehicles parked beside each other. He said he then returned to Jasper and ate breakfast and had started back to the area of the bridge to search for Johnson and Woods when he met them in Mr. Waters' pickup after they had found Mr. Phillips.

The appellant, Ricketts, testified in his own defense. He said that when he arrived at his campsite after dark on June 8, the two smallest children mentioned about having seen a man on the creek bank without any clothes on. He said he went to bed but could not sleep. He then testified as follows:

"Q. Why couldn't you sleep?

A. For studying about this man—these men—coming in from out of state, abusing my family while I was off working trying to make a living."

Mr. Ricketts testified that he got up and went outside and chunked up the campfire and sat there awhile and probably drank two cans of beer. He said that after sitting at his campfire awhile he got into his automobile and went to his home about six miles away and in doing so he had to drive by Mr. Phillips' camp. He said he blew his horn as he passed Phillips' camp and when he reached his home he exchanged his automobile for his truck. He said he got his 30-30 Winchester rifle and his .22 pistol and returned to Mr. Phillips' camp in the truck. Mr. Ricketts then testified as follows:

"Q. What did you do when you got back to camp, Mr. Ricketts?

A. I cut a green stick and fastened it in under the steering wheel on the top of my horn and I left my lights shining through the camp and I got out to the side of my truck and hollered a time or two; I shot the gun a time or two.

Q. Where did you shoot the gun?

A. Straight up.

Q. Why did you holler?

A. I wanted to know if somebody was there, and if they had disturbed somebody, I thought I had the same right to disturb them as they did to disturb somebody.

Q. Did you see Ward Phillips there?

A. Yes sir, my family told me that Ward had been there and I figured he was there and I hollered for Ward.

Q. Did he come out to where you were?

A. No, but he asked me to come down to the camp where he was.

Q. Did you go down there?

A. Yes, sir, I did.

Q. Did you see these two men from Missouri at any time?

A. No, sir, I did not.

Q. Did you inquire of Ward where they were, or if they were there?

A. Yes, sir, I did.

Q. Did you tell him why you were upset or why you were there?

A. Yes, sir, I did.

Q. Did he make any response to your accusing them of being naked in the river?

A. I don't remember what he said about it, but he said there was nobody with him.

Q. He said there was nobody else there?

A. Yes, sir.

Q. What happened after that?

A. He said that he would show me that they was nobody with him, so he shined the light in his camper and trailer and he shined the light in his truck and he had three beds, but they was nobody there with him."

Ricketts said he returned to his own camp but within about an hour, when it was coming daylight, he returned to Mr. Phillips' camp and Mr. Phillips was still alone. He said when Mr. Houston arrived at Phillips' camp,

he talked with Houston at the gate. He said Mr. Phillips was present at the gate but left while he talked with Houston. He said he asked Mr. Houston to help him get his truck started and he did so with jump cables from his own truck. He said he backed his truck through Mr. Phillips' gate and then talked with Mr. Phillips some more. He said he then drove his truck down to the low water bridge where he met Mr. Houston coming back across the bridge. He said he talked a few minutes there with Houston and then drove his own truck across the bridge and turned around and came back up the hill to talk some more with Mr. Phillips. He then testified as follows:

"Q. What did you do at that point?

A. I first turned towards the camp, then I seen Ward's camper sitting at the top of the hill, and I wanted to talk to him some more so that he could tell me about these guys that was with him.

Q. You were looking for these two men from out of state?

A. Yes, sir.

Q. Did you go to where Ward's camper was parked?

A. Yes, sir.

Q. Was it parked by the side of the road?

A. Yes, sir.

Q. How far from the camp turnoff up the hill was the camper parked?

A. I would say three hundred yards or something, two or three, I couldn't tell just which.

Q. Did you stop at the truck there?

A. Yes, sir, I did.

Q. Mr. Ricketts, tell the jury what took place at that point.

A. Ward had pulled over to the side of the road and when I went to the back of the truck, I pulled around past his truck and got out of my truck and walked back beside his and he jumped out of his truck and he says 'Damn you, you knocked my gate down,' and I said 'Ward you told me last night that was not your gate'· and he started to crowding me and I went to running backwards, and I backed a circle in the road, back near his camper and I kept hollering for him to stop.

Q. Where were his hands?

A. His right hand was in his pocket and I don't remember where his left hand was.

Q. Go ahead, what happened then?

A. Well, he didn't stop, and I jerked the gun out and I thought I shot it three times.

Q. The first time you shot the gun, in which direction was it pointed?

A. Straight up.

Q. And then you fired again?

A. I fired three times real fast, two or three times real fast.

Q. What did Ward say or do?

A. Ward stopped, and he said 'Ardell you shot me,' and I said 'no, I didn't, Ward,' and he said 'yes, you did' and I looked at him and seen he was shot.''

Mr. Ricketts then testified that he asked Mr. Phillips if he thought he could drive and Phillips indicated he could. He said he told Mr. Phillips that he would help him get to a doctor so he jumped in his own truck and took off up the road ahead of Mr. Phillips' truck. He said when he could not see Phillips' truck following him, he backed into a side road and when Mr. Phillips

never did drive by, he turned around and went back and found Mr. Phillips lying beside his truck. He said he then went straight back to his camp. He testified that he was not especially afraid of Mr. Phillips but that he was afraid he had a gun and that he was also aware that there were two more men down there with him somewhere. He said he was upset over the thoughts of men parading around naked before his wife and children but that he never did find the men who were with Mr. Phillips.

On cross-examination Mr. Ricketts testified that he became aware that Mr. Phillips had been shot when he saw a little spot on him somewhere along his chest. He said he did not know whether he shot Mr. Phillips or not; that there were two other men around somewhere but that he did not hear other gunshots or see anyone else shoot Mr. Phillips. Mr. Ricketts identified the pistol offered in evidence as the one he had strapped on when he was talking to Mr. Houston at the Phillips' camp. He testified that he was about seven feet from Mr. Phillips when Mr. Phillips was shot. He said Phillips was advancing toward him with his hand in his pocket.

> "I told him to stop or I would shoot and he was talking at the same time, I don't know what he said, but I repeated three or four times; I jerked the gun out and shot it up in the air real fast to try to get him to stop, because I had went back as far as I could without turning my back on him."

Mr. Ricketts then was asked and answered the following questions:

> "Q. . . . [I]s it your position that you shot Ward Phillips to protect your own life, is that what you are saying?
>
> A. No, sir, I didn't say that. I will not say that I shot him to protect my own life.
>
> Q. Then, there wasn't any reason for you to shoot him, was there?
>
> A. That we don't know.

Q. You told Ralph Wallen you shot him, didn't you?

A. I don't remember.

\* \* \*

Q. If you think somebody else shot him out there, why didn't you come in and tell somebody about it?

A. Because he told me I shot him, because I had been up practically for about thirty something hours without sleep, and I was mad and aggravated at the two guys that was down there, and I guess I just got scared, and panicked, is all I know.

Q. Wouldn't it be closer to the truth that you were mad at Ward Phillips because he wouldn't tell you who these people; you saw he was leaving and when he wouldn't tell you, you shot him?

A. No, sir."

Mr. Ricketts was asked what he was going to do with Mr. Johnson and Mr. Woods if he had found them. His testimony on that point is as follows:

"A. I was going to bring them and let my family identify them.

Q. You were going to drag them back up there and have your family identify them?

A. Yes, sir.

Q. Then what were you going to do with them—shoot them?

A. We are supposed to have a law that prosecutes people like that."

Continuing on cross-examination Mr. Ricketts was asked when did he go back to Mr. Phillips' camp the following morning and his testimony was as follows:

"A. Just about daylight—it wasn't good daylight, but you could see.

Q. Did you ever have your truck down there where the camper was?

A. Yes, sir, I did.

Q. When did you do that?

A. After I run backwards through the gate."

Mr. Ricketts testified on cross-examination that when Mr. Phillips failed to show up while he was waiting for him in a side road, he drove back to where Mr. Phillips' truck had stopped and he then testified as follows:

"Q. Where was he when you saw him that time?

A. He was laying by his truck in the edge of the road.

Q. What did you do then?

A. I slowed up, and I thought he was dead and I went on back to the camp.

Q. You just left him there to die, is that right?

A. I thought he was already dead.

Q. But did you stop to see?

A. No, I did not stop to see."

The county sheriff testified that Phillips' truck had run from the road and was damaged from an impact against a tree. He testified as to the considerable amount of blood he observed inside, as well as outside and around, Phillips' wrecked vehicles. Certainly the evidence was sufficient to sustain the conviction for second degree murder and the jury was very lenient in assessing the minimum sentence of five years in this case. We are of the opinion that Ricketts' own testimony would have sustained his conviction.

The appellant's second contention is that the court erred in instructing the jury on first degree murder. Under Ark. Stat. Ann. § 41-2205 (Repl. 1964) willful, deliberate, malicious and premeditated killing constitutes murder in the first degree; all other murder is murder in the second degree, § 41-2206. The trial court did not err in giving the first degree murder instruction for two reasons. In the first place, the evidence we have already set out would have sustained a jury verdict of murder in the first degree. In the second place, the jury only found Mr. Ricketts guilty of murder in the second degree, and he could not have been prejudiced by the instruction on murder in the first degree. *Brewer* v. *State*, 251 Ark. 7, 470 S. W. 2d 581.

The appellant next contends that the court erred in failing to inform the jury at the beginning of the trial that the defendant was presumed innocent until proven guilty. This assignment is totally without merit. Ark. Stat. Ann. § 43-2134 (Repl. 1964) provides as follows:

"When the evidence is concluded, the court shall on motion of either party, instruct the jury on the law applicable to the case."

The court did give the instruction on presumption of innocence at the conclusion of the evidence in this case.

The appellant next contends that the court erred in removing a prospective juror because he stated that he would not send the defendant to the penitentiary if he found him guilty. This assignment is so totally without merit we do not dwell upon it except to point out that the appellant's peremptory challenges were not exhausted in this case.

Appellant next contends that the state failed to produce evidence that it should have known would be beneficial to the appellant. This assignment is likewise without merit. The appellant argues that the .22 caliber bullet found to have been fired from Ricketts' gun was offered in evidence under testimony that it fell from Phillips' clothing, and the appellant's attorney did not discover until after the trial that the shirt Mr. Phillips

was wearing at the time he was shot had a bullet hole in the back as well as in the front. He argues that the prosecuting attorney had possession of Mr. Phillips' clothing and failed to reveal to the defense that the shirt contained two bullet holes. The prosecuting attorney explained at the hearing on a motion for a new trial, that he did not offer the shirt in evidence because of its blood stained condition and that the shirt and other clothing were available to the defense upon request at all times. This is not denied by the appellant.

The judgment is affirmed.