223 N.J. Super. 586 (1988)
539 A.2d 330
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
IAN TRONCHIN, A/K/A "T", DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted January 25, 1988.
Decided March 22, 1988.
*587 Before Judges DREIER and ASHBEY.
*588 Alfred A. Slocum, Public Defender, attorney for appellant (Donald T. Thelander, Assistant Deputy Public Defender, of counsel and on the brief).
W. Cary Edwards, Attorney General, attorney for respondent (Boris Moczula, Deputy Attorney General, of counsel; Cherrie Black, on the brief).
The opinion of the court was delivered by ASHBEY, J.A.D.
Defendant Ian Tronchin, a/k/a "T", was tried to a jury and acquitted of kidnapping (N.J.S.A. 2C:13-1b(1)), first-degree aggravated sexual assault (N.J.S.A. 2C:14-2a(3)) and third-degree terroristic threats (N.J.S.A. 2C:12-3). He was found guilty of second-degree sexual assault (N.J.S.A. 2C:14-2c(1)), a lesser included offense of first-degree aggravated sexual assault and sentenced to imprisonment for a period of five years. A $25 Violent Crimes Compensation Board penalty was also assessed.
On appeal from the judgment of conviction defendant contends that the jury's finding that he was guilty of second-degree sexual assault was the result of a compromise verdict, made possible because the court erroneously denied his motions for acquittal at the end of the State's case concerning kidnapping and aggravated sexual assault.
At trial the State presented evidence that on September 5, 1985, at approximately 12:15 a.m., R.M., a ticket agent for the Olympia Trails Bus Company, completed her shift at the Newark Airport and caught the bus to Grove Street and Springfield Avenue in Irvington. She walked down Springfield Avenue, stopped at a bar and called a friend to pick her up. R.M. waited outside the bar knowing that if her friend was not there within the hour, it meant that his car would not start and that he was not coming. While she waited, she saw defendant and a female passenger drive up. They asked her if she wanted a ride. She declined. About 20 to 25 minutes later, defendant's companion left and defendant again offered R.M. a ride to her home. *589 More than an hour having passed and her friend not appearing, R.M. accepted defendant's offer. She said she asked him to "just drive me down Springfield Avenue." Defendant gave his name as "T". He drove two blocks down Springfield before he turned off the main street, suggesting to R.M. that they "ride around for awhile." R.M. said that she "figured it was okay." They talked in a conversational, social manner. Defendant told R.M. about his girl friend and his former job. They rode around for hours. After a while, defendant parked the car, got out, and engaged in conversation with people on the street. R.M. said that she did not know where she was. She expressed no fear.
Defendant returned to the car. He told R.M. that she could drive the car, but not in the city. He drove the car through winding roads ending up at the South Mountain Reservation, a park in South Orange. R.M. said she did not know the road. R.M. said that at no time prior to arriving at the Reservation was sex a topic of conversation. R.M. said she told defendant that she wanted to go home on three separate occasions during the drive.
When they arrived at the park, it was dark and deserted. Defendant shut off the engine and told her that she "was going to be his woman and he wanted [her], and stuff like that." He insisted that she get out of the car, telling her that "when the car cools off, we are going to leave." Once out of the car defendant was "grabbing onto [her] and kissing [her]." R.M. said that she demanded to be taken home, telling defendant that she would walk if necessary. Defendant again promised to take her home, saying, "I hate to see what [those white boys out there] will do to you."
R.M. said defendant then told her that "he wanted to have sex with [her]." She refused. "Then he told [her] that [she] was going to do it and if she didn't do it what he was going to do to [her]." R.M. continued to resist and defendant threatened to really give her something to cry for if she didn't "shut *590 up." R.M. said defendant then put her "up on the car," pulled off her underwear, and forced sexual intercourse.
R.M. said that prior to sexual intercourse, defendant "made [her] feel him and get him hard." He also told her she was going to "give him some head." Since she was "crying real loud," he covered her mouth, having vaginal sexual intercourse with her twice, once from the front and once from behind. Except for her underwear, R.M. remained fully clothed.
Defendant then told R.M. that she "had better not tell or get him into trouble, because he is not going to get in trouble for [her]." He also said, "well, I know you are going to tell anyway. I might as well get rid of you now."[1] As he looked in the car, she heard the sound of a hard object. She kicked off her shoes as she ran two blocks to the street. Defendant drove over the grass after her. Reaching the highway, she kept running until she found someone to help. A stranger testified to her distraught, shoeless condition at that time. It was then 6:00 a.m.
Defendant testified that he drove R.M. to her home, but that she told him that she did not want to go inside her home "right at the moment, because her mother had her child." They then drove around. Defendant said that he stopped the car at the Hideaway Lounge to talk to his friends. He said that while driving with R.M. he "thought about making out, you know with her because she had been acting like she wanted to make out and whatnot." Because of his perception that R.M. was willing, he drove to South Mountain Reservation. He said they had intercourse voluntarily following which R.M. asked him for $40. When defendant refused, she "became hysterical." Defendant said he told her that he was leaving and that she was welcome to leave with him, but also reiterated that he was not going to give her the $40. R.M. became "real hysterical." *591 Defendant testified that he "panicked, ... got scared and drove off. [He] drove off and left her there." Defendant denied forcing R.M. to have intercourse, or transporting R.M. with the intention to force her to have intercourse. He said that all of R.M.'s conduct had been consensual.
At the close of the State's case defendant moved for a judgment of acquittal on the charges of kidnapping and aggravated sexual assault (aggravated because committed during a kidnapping, N.J.S.A. 2C:14-2a(3)), asserting that the State failed to establish "removal or confinement," or that R.M.'s removal or confinement was "unlawful" because "accomplished by force, threat, or deception" as required by N.J.S.A. 2C:13-1d.
We consider defendant's challenge to the quantum of evidence adduced to prove the elements of "deception" and of "removal or confinement," pursuant to N.J.S.A. 2C:13-1d, to have merit. The court ruled,
[a]s I read the statute, if the defendant by deception got the victim to come into his car, that is kidnapping. Then he removed her a substantial distance from that place for the purpose of committing an aggravating [sic] sexual assault; that is, kidnapping.
We agree with the judge's statement of the law. N.J.S.A. 2C:13-1b and d provide:
b. A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period, with any of the following purposes:
(1) To facilitate commission of any crime or flight thereafter.
* * * * * * * *
(2) ... If the actor releases the victim unharmed and in a safe place prior to apprehension, it is a crime of the second degree.
* * * * * * * *
d. A removal or confinement is unlawful within the meaning of this section and of sections 2C:13-2 and 3 if it is accomplished by force, threat or deception....
* * * * * * * *
*592 Our disagreement with the court is in its application of the law to the facts which the State adduced in this case.
We first examine the "deception." From R.M.'s testimony, there was only one stated purpose when she got in the car which was for defendant to drive her home, as he told her that he would do. If R.M. first entered the car because of that deception, however, the record is clear that this deception did not continue undiminished because R.M. said that defendant later told her that he would let her drive the car away from the city, apparently as an explanation for why she remained in the car while he took her to the park. Obviously that reason for her continuing to drive with him had nothing to do with taking her home.
Defendant and R.M. were strangers. Neither claimed that R.M. got into the car on the understanding that their mutual purpose was to share each other's company. Whether that shared purpose developed was a question of fact from the evidence of hours of mutually acceptable driving and agreeable conversation. Based upon R.M.'s testimony we consider the question of whether the State established that defendant continually deceived R.M. debatable.[2]
We need not rule, however, on whether the evidence supported a finding of constant deception because we are convinced that the State did not establish that R.M. was "confined" or "removed" by the deception. The elements of kidnapping are to be narrowly construed. The following are excerpts *593 from the Final Report of the New Jersey Criminal Law Revision Commission, Final Report, Vol. II at 181, sec. 2C:13-1 (1971).
Kidnapping which was only a misdemeanor at common law, has become in modern legislation one of the most severely punished offenses.
Overbreadth is now the problem:
`The central problem of legislative reform in this field is to devise a proper system of grading to discriminate between simple false imprisonment and the more terrifying and dangerous abductions for ransom or other felonious purpose. In particular, provision for the death penalty must be consistent with general policy in this regard embodied in sections dealing with murder and attempted murder.
* * * * * * * *

`And it is desirable to restrict the scope of kidnapping, as an alternative or cumulative treatment of behavior whose chief significance is robbery or rape, because the broad scope of this overlapping offense has given rise to the serious injustice....
* * * * * * * *
`The blame cannot be placed exclusively at the door of the prosecutor for choosing to indict for kidnapping. When an especially outrageous crime is committed there will always be public clamor for the extreme penalty which the laws permit, and it is precisely the obligation of penal legislators to minimize opportunities for such injustice by clearly and rationally restricting discretion to punish.[3]
* * * * * * * *
`It is necessary, therefore, to define an aggravated offense of kidnapping which shall consist of removal or confinement involving substantial isolation of the victim where the duration of the isolation, the intention of the kidnapper, or other circumstances makes the behavior specially terrifying and dangerous. [Final Report, Vol. II at 181-183, sec. 2C:13-1 (1971), quoting MPC T.D. 11, pp. 11-15 (1960), emphasis added.]
R.M. specifically testified that she was in no fear until the actual assault. Despite testimony that it was dark and the area unknown, R.M. never said that she was confined when defendant stopped or drove the car. There was no evidence that R.M. could not have left the car at any time if she wished. We *594 conclude that "removal" and "confinement," whether by deception or otherwise, was not established.
We need not pass upon defendant's contention that the State seeks to apply the kidnapping label to every instance where a woman who voluntarily enters a man's car on a date is subsequently sexually assaulted. We agree with the State and the trial judge that where an offender entices a victim into a car by deception, transports the victim to a remote place without opportunity for the victim's escape and commits sexual assault, all of the elements of kidnapping may be established. We merely conclude that the State's evidence did not support such a finding in this case and defendant's motion for acquittal on the kidnapping and first-degree sexual assault should have been granted.[4]
We are nonetheless convinced that defendant's claim that he was prejudiced by the court's failure to acquit him of kidnapping at the end of the State's case is without merit. Contrary to State v. Christener, 71 N.J. 55, 69-70 (1976), we do not find that there was a real possibility that the jury was misled.
We are mindful of the Supreme Court's instruction in State v. Christener, 71 N.J. at 73 that "it should be regarded as error for a trial judge to deliver a jury instruction on a criminal charge for which there is no, or insufficient evidence to support the instruction." However, in State v. Thomas, 76 N.J. 344, 365 (1978) the Court clarified this statement by stating, "[o]ur holding in Christener does not stand for the proposition that reversal is mandated every time a judge charges a jury about a *595 crime for which there may be insufficient evidence to support a conviction."
The Christener court was particularly concerned with the harm of overcharging in homicide cases. 71 N.J. at 72. Unlike the facts in Christener, where "there was a real possibility that the jury could have found the defendant not guilty," id. at 69, the evidence clearly supported the sexual assault conviction, the elements of which were entirely separate from the kidnapping.
Affirmed.
NOTES
[1] As previously noted, defendant was acquitted of the charge of terroristic threats.
[2] The State relies upon many out-of-state interpretations of confinement by deception. State v. Holt, 223 Kan. 34, 574 P.2d 152 (1977); United States v. Hughes, 716 F.2d 234, 236-237 (4th Cir.1983); United States v. Hoog, 504 F.2d 45, 50-51 (8th Cir.1974), cert. den. 420 U.S. 961, 95 S.Ct. 1349, 43 L.Ed.2d 437 (1975); Bates v. State, 267 Ind. 8, 366 N.E.2d 659, 661-62 (1977); Bowen v. State, 263 Ind. 558, 334 N.E.2d 691, 692-93 (1975); Shipman v. State, 243 Ind. 245, 183 N.E.2d 823, 826 (1962) cert. denied 371 U.S. 958, 83 S.Ct. 515, 9 L.Ed.2d 504 (1963); State v. Garcia, 100 N.M. 120, 666 P.2d 1267, 1271-72 (App. 1983), certif. den. 100 N.M. 192, 668 P.2d 308 (1983). We regard the facts of each as distinguishable.
[3] We note that, at opening, the Prosecutor said little about the kidnapping.
[4] On appeal defendant also contends that there was no evidence that he failed to release R.M. unharmed and in a safe place prior to his apprehension. While we agree with his other assertions, we reject any contention that R.M. suffered neither physical nor emotional injury, and was thus released unharmed, N.J.S.A. 2C:13-1c(1); see State v. Federico, 103 N.J. 169, 175-176 (1986), although at trial the Prosecutor appeared to concede the contrary.