939 A.2d 781

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
DAVID L. WILDER, DEFENDANT–RESPONDENT.

Argued September 25, 2007—Decided January 31, 2008.

400

*Steven J. Brizek,* Senior Assistant Prosecutor, argued the cause for appellant (*James F. Avigliano,* Passaic County Prosecutor, attorney).

*Amira R. Scurato,* Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

*Robert E. Bonpietro,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Anne Milgram,* Attorney General, attorney).

Justice LaVECCHIA delivered the opinion for the Court.

In a senseless act of savagery, defendant David Wilder stomped to death a helpless young man. The Appellate Division determined that the trial court committed plain error in including first-degree murder among the array of charges against defendant that were sent to the jury. Notwithstanding that the jury acquitted defendant of murder, the appellate panel reversed defendant's conviction on the lesser-included offense of aggravated manslaughter. The panel found that there was a "real possibility" that defendant was prejudiced by jury overcharge caused by inclusion of the murder charge. *See State v. Christener,* 71 *N.J.* 55, 69–70, 362 *A.*2d 1153 (1976).

Now this case is before us on the State's petition for certification. *State v. Wilder,* 189 *N.J.* 428, 915 *A.*2d 1050 (2007). The State urges this Court to enforce *State v. Reyes,* 50 *N.J.* 454, 458–59, 236 *A.*2d 385 (1967), and, in adhering to that standard when reviewing the sufficiency of the State's proofs, to reverse and

reinstate defendant's conviction for aggravated manslaughter. The State and the Attorney General, as amicus curiae, further ask that we overrule and eliminate the confounding influence of *Christener, supra*, with its unique standard for reversible error applicable to jury-overcharge claims. 71 *N.J.* at 69–70, 362 *A.*2d 1153.

We hold that the appellate court misapplied the *Reyes* standard and, therefore, we reverse and reinstate defendant's conviction for aggravated manslaughter. Furthermore, we find that the *Christener* standard is inconsistent with *Rule* 2:10–2 and our harmless error jurisprudence, irreconcilable with the respect that we accord to a jury's verdict that is based on sufficient evidence, and unreliable in application. For all those reasons, we reject further use of *Christener* in connection with claims of jury overcharge.

## I.

The prosecution of defendant arose from an incident in which he used a heavy-duty construction boot to stomp on the head of the prostrated Kevin McGuire, killing him. At trial, the State presented the following facts leading up to McGuire's death.

On March 25, 2002, an unsettled drug transaction prompted an altercation involving Kathleen Lewis, McGuire, and a group of juvenile drug dealers. During that dispute, McGuire was punched in the face. When the juveniles fled, Lewis used her car to chase them. Her boyfriend, McGuire, was in the passenger seat. During the chase Lewis lost control and crashed her vehicle into the storefront of Wilder's shoe store in Paterson. Enraged by the damage, Wilder rushed from his store, yelling and cursing, and stopped Lewis from leaving the accident scene before police could arrive.

Wilder then directed the brunt of his anger towards McGuire. Witnesses heard Wilder and co-defendant Nasheem Benjamin talking about McGuire, saying that they were going to "f* * * him up" after the police left. Once a police officer had come and gone from the accident scene, Benjamin chased McGuire to a nearby

street and punched him in the face. The single blow knocked McGuire to the ground between two vehicles parked on the street.

McGuire was attempting to get up, using his hands and arms to push himself off the pavement, when Wilder ran up to him. While McGuire's head was inches above the ground, Wilder raised his knee and drove his foot down on the temple portion of McGuire's head. Wilder was wearing heavy-duty construction boots. The direct downward force of the blow slammed McGuire's skull into the street pavement. A loud smacking noise could be heard as McGuire's head struck the pavement. Blood appeared to flow from every orifice of Wilder's head—his nose, mouth, and ears. Even his eyes appeared to discharge blood and to roll up into the back of his head.

Appearing to be shocked by Wilder's act, Benjamin attempted to help McGuire to his feet. Wilder, however, shouted at Benjamin to "leave him there; [he's] still breathing." Nevertheless, Benjamin remained with McGuire after Wilder left and attempted aid while an ambulance was called for assistance. McGuire somehow remained conscious after the accident, but he continued to bleed, could not recall what happened to him, and had difficulty standing or attempting to walk. Emergency medical technicians immobilized McGuire and transported him to a hospital where he died hours later.

Autopsy evidence revealed that McGuire died from the blow to his temple, which fractured his skull and led to brain herniation. The blow fractured a temporal bone as well as the petrous bone, described as the thickest in the human skull. The force of the blow caused a fracture, four-and-one-half inches in length, which extended into the base of McGuire's skull.

On June 16, 2004, Wilder was tried for first-degree murder, *N.J.S.A.* 2C:11–3(a)(1) and (2); and third-degree endangering an injured victim, *N.J.S.A.* 2C:12–1.2. The State produced testimony from Shanica Mosley, Tyshon Adams, Montel Mosley, and other eyewitnesses. Shanica Mosley observed the entire incident involving Benjamin, Wilder, and McGuire and described it as set forth

herein. She also heard Wilder tell a shocked Benjamin to "leave him there; [he's] still breathing" after Wilder stomped on McGuire's head. And, she testified to watching Wilder leave the area after McGuire began to bleed and to observing Benjamin try to aid McGuire. Tyshon Adams corroborated most of Shanica's testimony. Montel Mosley saw Wilder quickly walk away from the scene and heard someone in the crowd say that Wilder stomped McGuire "in his face."

In addition to the eyewitness testimony directly implicating Wilder in McGuire's injuries, the prosecution's medical expert testified that McGuire's death resulted from injuries sustained from Wilder's stomp or kick to McGuire's temple area. The medical expert further opined that McGuire's wounds were consistent with a stomp to the head, rather than an accelerated fall.

At the close of the State's case, Wilder moved for a judgment of acquittal, claiming only that the State's witnesses lacked credibility. Noting that questions of credibility were for the jury to determine, the trial court denied the motion. Stating the broad test for such a motion under *Rule* 3:18–1, the court concluded that, after giving all favorable inferences to the State, a reasonable jury could find defendant guilty of the murder and helpless-victim charges. The judge explained that, in respect of the murder charge,

> there is direct eyewitness accounts of the defendant kicking, or what has been described as stomping, the victim by pressing his foot while wearing a work boot[ ] on the [victim's] head ... as the victim was in an incapacitated position on the ground and attempting to right himself off the ground, off the pavement or the street. And while he was on all fours on the ground, this blow, which was described here in the courtroom in rather chilling fashion, was inflicted and the consequences of the blow are in evidence.
>
> Based on that, I'm satisfied that a jury could conclude that the defendant purposely caused serious bodily injury that then resulted in the death of Kevin McGuire.

Defendant's case consisted of eyewitness and expert testimony contradicting the State's witnesses. The trial court instructed the jury on first-degree murder, including an explanation of serious-bodily-injury murder (SBI murder). The jury acquitted on the

first-degree murder charge, but found defendant guilty of aggravated manslaughter as a lesser-included offense. The jury also found defendant guilty of endangering a helpless victim. On the aggravated-manslaughter conviction, the court sentenced defendant to a prison term of twenty-three years, with a parole ineligibility period of eighty-five percent of the term. The court also imposed a consecutive five-year prison term for the conviction for endangering a helpless victim. As noted, the Appellate Division reversed defendant's aggravated-manslaughter conviction not because there was insufficient evidence to support the jury's verdict, but rather because the panel believed the jury was overcharged and that *State v. Christener*, 71 *N.J.* 55, 362 *A.*2d 1153 (1976), required reversal in these circumstances.

## II.

The State characterizes this appeal as a tale of two cases: *State v. Reyes*, 50 *N.J.* 454, 236 *A.*2d 385 (1967), which allegedly was misapplied in the appellate review of the sufficiency of the evidence for the SBI murder charge, and *State v. Christener*, 71 *N.J.* 55, 362 *A.*2d 1153 (1976), which allegedly confounds proper appellate review in cases that involve a claim of jury overcharge.

*Reyes, supra,* enunciated the present, well-established standard for determining the sufficiency of the evidence against an accused on a *Rule* 3:18–1 motion for acquittal. 50 *N.J.* at 458–59, 236 *A.*2d 385. The *Reyes* test requires the trial court to determine "whether, viewing the State's evidence in its entirety . . . and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt . . . beyond a reasonable doubt." *Id.* at 459, 236 *A.*2d 385. The State urges that we enforce the *Reyes* standard and that we rectify the Appellate Division's review of the sufficiency of the evidence on the SBI murder charge against defendant.

The State also asks us to jettison the confusing standard of review developed for jury-overcharge cases, known as the "*Chris-*

*tener* rule." In *Christener, supra,* this Court stated that reversible error occurred when a trial court issued a jury instruction on a criminal charge for which there was "insufficient evidence to support the instruction." 71 *N.J.* at 73, 362 *A.*2d 1153. Because our Court "assumed that the jury [had] inferred by the giving of such an instruction that the elements of that charge were present in the case," the conviction of the lesser-included charge was reversed. *Ibid.*

The *Christener* holding was clarified somewhat in *State v. Thomas,* 76 *N.J.* 344, 365, 387 *A.*2d 1187 (1978), in which this Court stated that reversal would not be mandated whenever a jury received instructions on a crime that is unsupported by the evidence. In *Thomas,* we explained that the *Christener* rule was intended to protect against "the prejudicial effect of 'overcharging,' or instructing the jury on a crime more serious than is warranted by the evidence." *Ibid.* We held that

the giving of an instruction that correctly states the law, but is inapplicable to the facts or issues before the court is error, but that prejudice must be shown in order to constitute it reversible error. In cases where as a result of improper undercharging or other circumstances a charge not based on the evidence can only redound to defendant's benefit, harmless error has been found.

[*Ibid.* (citations omitted).]

As presently clarified, the *Christener* rule requires a reviewing court to engage in a two-step inquiry. The court must determine (1) whether the trial court overcharged the jury; and (2) whether the overcharge resulted in prejudice and, therefore, reversible error. *See ibid.; Christener, supra,* 71 *N.J.* at 73, 362 *A.*2d 1153; *see also State v. Moore,* 330 *N.J.Super.* 535, 542–43, 750 *A.*2d 171 (App.Div.), *certif. denied,* 165 *N.J.* 531, 760 *A.*2d 784 (2000). As for the standard for prejudice, courts regard the following discussion in *Christener* as instructive:

On the record in this case, there was a *real possibility* that the jury could have found the defendant not guilty. Hence, the possibility that the jury, in the absence of sufficient evidence to sustain a first degree murder charge, may have reached a compromise verdict suggests that [the defendant] may have suffered prejudice by that instruction in spite of his manslaughter conviction.

[71 *N.J.* at 69–70, 362 *A.*2d 1153 (emphasis added).]

*See also State v. Cooper,* 151 *N.J.* 326, 450, 700 *A.*2d 306 (1997) (Handler, J., dissenting), *cert. denied,* 528 *U.S.* 1084, 120 *S.Ct.* 809, 145 *L.Ed.*2d 681 (2000); *State v. Brown,* 325 *N.J.Super.* 447, 454–56, 739 *A.*2d 975 (App.Div.1999), *certif. denied,* 163 *N.J.* 76, 747 *A.*2d 285 (2000); *State v. Tronchin,* 223 *N.J.Super.* 586, 594–95, 539 *A.*2d 330 (App.Div.1988). In sum then, in jury-overcharge cases, reversible error occurs when there is a "real possibility" that the jury might have acquitted the defendant of the lesser-included offense, absent the erroneous instruction on the greater charge. *See Christener, supra,* 71 *N.J.* at 69–70, 362 *A.*2d 1153; *see also Tronchin, supra,* 223 *N.J.Super.* at 594–95, 539 *A.*2d 330.

The starting point for this appeal, under any analysis, is to determine whether the trial court correctly denied defendant's motion for acquittal of the murder charge.

## III.

### A.

Under the New Jersey Code of Criminal Justice (Code), criminal homicide constitutes murder when: "(1) The actor purposely causes death or serious bodily injury resulting in death; or (2) The actor knowingly causes death or serious bodily injury resulting in death." *N.J.S.A.* 2C:11–3(a)(1), –3(a)(2). The Code defines "serious bodily injury" as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *N.J.S.A.* 2C:11–1(b).

The Code recognizes two mental states that can justify culpability for SBI murder. A person can be found guilty of "purposeful" SBI murder if the actor's purpose was to inflict serious bodily injury, but the actor nevertheless "knew that the injury created a substantial risk of death and that it was highly probable that death would result." *State v. Cruz,* 163 *N.J.* 403, 417–18, 749 *A.*2d 832 (2000); *see also State v. Jenkins,* 178 *N.J.* 347, 362, 840 *A.*2d 242 (2004). Alternatively, a person can be

found guilty of "knowing" SBI murder when the State makes the same showing, but "rather than proving that serious bodily injury was [the] defendant's conscious objective, it ... demonstrate[s] that he 'was *aware that it was practically certain* that his conduct would cause serious bodily injury.'" *Jenkins, supra,* 178 *N.J.* at 362–63, 840 *A.*2d 242 (quoting *Cruz, supra,* 163 *N.J.* at 418, 749 *A.*2d 832). The State also must prove that the defendant's conduct resulted in the victim's death. *Id.* at 362, 749 *A.*2d 832.

In *Cruz, supra,* we highlighted the requisite mental state for SBI murder by comparing its standard to the elements of aggravated manslaughter. 163 *N.J.* at 417–18, 749 *A.*2d 832. Under the Code, a person commits aggravated manslaughter by "recklessly caus[ing] death under circumstances manifesting extreme indifference to human life." *N.J.S.A.* 2C:11–4. SBI murder is distinguishable from aggravated manslaughter because the latter, lesser charge does not require an intention to cause serious bodily injury or an awareness that death is *"practically certain"* to follow. *Cruz, supra,* 163 *N.J.* at 417–18, 749 *A.*2d 832 (emphasis added). Rather, "[i]n assessing whether a defendant has manifested extreme indifference to human life, the focus is not on the defendant's state of mind, but on the circumstances under which the defendant acted." Cannel, *New Jersey Criminal Code Annotated,* comment 2 on *N.J.S.A.* 2C:11–4 (2007); *see also Cruz, supra,* 163 *N.J.* at 417–18, 749 *A.*2d 832 (discussing distinction between SBI murder and aggravated manslaughter).

In sum, a person is guilty of aggravated manslaughter if the actor causes death with "an awareness and conscious *disregard* of the *probability* of death." *Jenkins, supra,* 178 *N.J.* at 363, 840 *A.*2d 242 (internal quotation marks omitted). For SBI murder, the defendant must be shown to have "[ (1) ] knowingly or purposely inflicted serious bodily injury with *actual knowledge* that [ (2) ] the injury created a substantial risk of death and that [ (3) ] it was *'highly* probable' that death would result." *Ibid.*

B.

In this matter, the trial court instructed the jury on an array of charges. The court's instruction on murder included a full and correct explanation of both purposeful and knowing SBI murder. In relevant part, the court also instructed on passion/provocation manslaughter, aggravated and reckless manslaughter, SBI aggravated assault, as well as the legal concept of an "attempted" crime. Although the court allowed the murder charge to go to the jury, the jury acquitted defendant of murder. The question here is whether, based on the State's proofs and all reasonable inferences that could be drawn from the State's case, a jury reasonably could have convicted defendant of SBI murder.[1] We hold that a jury could so conclude.

Defendant's intentional acts—of using his heavily booted foot as a blunt instrument to strike the temple portion of McGuire's head, of raising that booted foot high into the air in order to generate as much force as possible from the downward smashing of the boot into the victim's slightly raised head, propelling it into the street pavement—could constitute purposeful conduct designed to cause serious bodily injury. A jury reasonably could find purposeful intention from the nature of the force, the quality of the force, and the mental and physical effort that defendant must have exerted to summon up the power that he brought to bear in that one blow to McGuire's head. The facts, in combination, could support a conclusion that it was Wilder's conscious objective to cause serious bodily injury and, further that prongs two and three of purposeful SBI murder were met as well. The jurors reasonably could conclude that one who inflicted such a forceful blow to a man's

---

[1] Defendant complains that the trial court failed to enunciate fully its analysis of the elements comprising purposeful or knowing SBI murder when it denied defendant's motion for acquittal. However, our appellate review is not impeded as a result. In reviewing the denial of the motion for acquittal based on insufficient evidence, the analysis focuses on the adequacy of the State's proofs at trial. See Reyes, supra, 50 N.J. at 458–59, 236 A.2d 385; see also State v. Josephs, 174 N.J. 44, 81–82, 86, 803 A.2d 1074 (2002).

head, propelling it into the street pavement inches away, where it smacked into that hard and unforgiving surface, would have known that the injury to the head and brain created a substantial risk of death and that it was probable that death would result.

At a minimum, a jury reasonably could find that those acts demonstrated awareness by defendant that it was practically certain that his conduct would cause serious bodily injury, even if the jury found that defendant lacked a conscious objective to cause serious bodily injury. Thus, the alternative "knowing" standard of culpability for SBI murder could have been found to exist.

The State's case was comprised, however, of more evidence to support the SBI murder charge. The jury heard Wilder's comment to Benjamin about McGuire after the incident. As Wilder was hurriedly leaving the scene, and Benjamin was attempting to help McGuire, Wilder callously told Benjamin to "leave him," that "[he's] still breathing." Applying *Reyes's* instruction that the facts be viewed in the light most favorable to the State, that utterance could be regarded as indicative that Wilder was conscious that something significant, by way of injury to the victim, had just occurred. As the State argued, those words showed that Wilder was moved to comment that his victim was still breathing, as though there was a substantial risk that what he had just done to McGuire could cause McGuire to stop breathing. A jury could have regarded defendant's comment as showing an awareness of the heightened probabilities that McGuire's life would end then and there as a result of Wilder's attack. The Appellate Division's assessment of the State's case simply did not afford the State the benefit of all the inferential bolstering support that could be drawn from Wilder's comment.

Finally, we note that the appellate panel underestimated the significance of the injuries when analyzing defendant's knowledge of the risk of death and the substantial likelihood of the injuries to cause death. Indeed, the panel's comment that the skull fractures did not include any fracture that was "depressed" or "displaced" seemingly minimized the injuries. However, defendant did not

stomp just anywhere on his victim. He planted his blow on the victim's head knowing, as he had to, that the victim's skull protected his brain. Defendant aimed his blow at the temple portion of his victim's head, driving the head into the street pavement. He carried out that blow with all the force his raised leg could generate, accelerated by the additional energy transferred through the heavy boot on his foot.

Inferences supportive of an intent to cause serious bodily injury could have been drawn by the jury based on the manner in which defendant fashioned this "weapon" that he used on his victim's head and from the injuries that could be expected to result. The medical evidence showed that defendant mustered enough force to fracture the thickest part of his victim's skull and to rip apart membranes containing the brain. It was the brain herniation from the tears to that membrane that ultimately caused death. The victim displayed immediate signs of severe head injuries when blood began to exude from his eyes, ears, nose, and mouth. Under *Reyes,* the trial court correctly accepted that evidence as reasonably supporting the murder charge, subject to the jury's credibility determinations.

In conclusion, we hold that the evidence produced overall by the State was sufficient to survive a motion for acquittal on the charge of murder. By including the murder charge among those sent to the jury in this matter, the trial court did not overcharge. We reverse the Appellate Division's holding to the contrary.

## IV.

Based on its determination of jury overcharge, the Appellate Division engaged in an analysis for prejudice under the *Christener* standard. Rather than viewing the alleged overcharge from the perspective of harmless error, *see Rule* 2:10–2, or plain error as would have been the case for this argument that was not raised before the trial court, the panel resorted to the *Christener* standard for reviewing the perceived jury-overcharge error. The panel determined that there was a real possibility that defendant

suffered prejudice from the court's delivery of the SBI murder charge to the jury. Specifically, the panel found that the jury might have convicted defendant on reckless manslaughter or an even lesser charge. However, because the SBI murder charge was given, the panel posited that the jury may have been dissuaded from those lesser charges based on the erroneous belief that the elements of SBI murder were present. Based on that reasoning, the panel concluded that defendant suffered the "real possibility" of harm and, further, that reversible error had occurred. Accordingly, the panel reversed the jury's conviction of aggravated manslaughter, notwithstanding the presence of sufficient evidence in the record to support the jury's verdict and the lack of any legal error tainting that verdict.

Although our different take on the sufficiency of the evidence for the SBI murder charge technically makes it unnecessary to parse the appellate panel's *Christener* analysis, this case demonstrates that *Christener* complaints of error continue to arise in criminal appeals. Moreover, this appeal highlights the need to address whether the *Christener* standard—of allowing actual prejudice to be presumed by the mere possibility of a compromise verdict—should persist. The argument advanced before us by the State, and the Attorney General as amicus curiae, is that *Christener* should be abandoned for two reasons: because it is inconsistent with our Court Rules governing appellate review of trial court error; and because it generates the unnecessary expenditure of resources in attempting to divine a jury's thought process notwithstanding that sufficient evidence supports the jury's determination. We have decided to take this opportunity to reexamine the *Christener* rule's value.

### A.

The underlying rationale for the *Christener* rule is the belief that a jury will infer that there is sufficient evidence to support a conviction on any crime for which it receives instructions. *See State v. Galloway,* 133 *N.J.* 631, 651, 628 *A.2d* 735 (1993); *see also*

*Christener, supra,* 71 *N.J.* at 72–73, 362 *A.*2d 1153. The *Christener* Court was convinced that an unsupported greater instruction creates a coercive effect on jury deliberations because the jury will use that inference to convict the defendant of a lesser-included offense, without engaging in a proper, objective evaluation of the evidence for the lesser crime. *Christener, supra,* 71 *N.J.* at 72–73, 362 *A.*2d 1153. In other words, the overcharge sets the stage for a compromise verdict. *Ibid.*

Criticism of *Christener*'s rationale has existed since its inception. Justice Schreiber's concurrence in *Christener, supra,* strenuously disagreed with the new rule and its underlying theory. 71 *N.J.* at 77–79, 362 *A.*2d 1153 (Schreiber, J., concurring). He argued that it was an "inflexible principle which will not further the cause of justice and will add unnecessary trials to an already overburdened criminal judicial system." *Id.* at 78, 362 *A.*2d 1153. Disagreeing head-on with the Court's assumption that an unsupported instruction on a greater charge would result in a guilty verdict on a lesser-included offense, calling it "sheer speculation and conjecture" because it was not supported by any evidence in the record, the Justice wrote,

> It is pure fancy to intimate that [the jury] agreed upon a manslaughter verdict as a result of a settlement of different positions. Whether or not there was enough evidence to justify submission of the first degree murder charge to the jury is not relevant in ascertaining whether the jury compromised on reaching its result. In any event under the circumstances here, the error, if any, of submitting a first degree charge to the jury was harmless.
>
> [*Ibid.*]

Although he concurred in the result in *Christener,* Justice Schreiber reiterated his concerns in a subsequent decision. *See State v. Martinez,* 97 *N.J.* 567, 576, 483 *A.*2d 117 (1984) (Schreiber, J., concurring) ("The *Christener* Court was sharply divided. I considered the majority's reasoning to be unsound and my conviction remains the same.").

In a similar vein, Judge Conford, joined by Justice Clifford, dissented in *Christener, supra,* objecting to the Court's application of the "real possibility" standard. 71 *N.J.* at 83, 362 *A.*2d 1153 (Conford, P.J.A.D., dissenting). Although the dissent conceded

some grain of truth to the possibility of an overcharge inducing a compromise verdict on a lesser-included charge, it rejected the Court's overall analysis, explaining that

> one cannot lightly jump to the conclusion of reversible error.... [T]he court here fails to appraise the likelihood that such a result transpired below by the established criterion of whether there was a "real" possibility that, or a "reasonable" doubt as to whether, the error led the jury to a result it otherwise might not have reached. In the terms of the practice rule, error is to be disregarded on appeal unless "clearly capable of producing an unjust result." *R.* 2:10–2. Administration of those criteria must be made in the light of the entire record.
> [*Ibid.* (citation omitted).]

Applying the familiar appellate error standard contained in *Rule* 2:10–2, the dissent concluded that any alleged error in *Christener* was harmless. *Ibid.*

## B.

■ As the original criticism of the *Christener* rule validly noted, the "real possibility" test for prejudice is an unreliable standard. Judicial review of the "real possibility" standard is based on guesswork and supposition. The expectation that an appellate court should embark on a reconstruction of a jury's thought process, without any evidence of jury compromise, whenever a jury receives an erroneous instruction, is problematic for several reasons.

■ First, it is, as Justice Schreiber noted, "pure fancy" to speculate that a jury's verdict on a lesser offense was a compromise. We credit juries for following instructions carefully and applying the facts, as found, to the law, as instructed. *See State v. Loftin,* 146 *N.J.* 295, 390, 680 *A.*2d 677 (1996) (citing *State v. Manley,* 54 *N.J.* 259, 271, 255 *A.*2d 193 (1969)). We expect and rely on "the ability of jurors to faithfully follow a trial judge's instructions in deliberating on a defendant's guilt." *State v. Muhammad,* 145 *N.J.* 23, 52, 678 *A.*2d 164 (1996). That precept is undercut by the *Christener* standard, which is premised on the assumption that jurors ignore the trial court's instructions regarding compromise verdicts. *See Thomas, supra,* 76 *N.J.* at 365, 387 *A.*2d 1187; *Christener, supra,* 71 *N.J.* at 73, 362 *A.*2d 1153.

Although in *Thomas, supra,* this Court asserted that the *Christener* standard did not result in a presumption of an automatic reversal, but rather that prejudice must be shown, that is belied by the "real possibility" standard. 76 *N.J.* at 365, 387 *A.*2d 1187. That standard anticipates that a reviewing court will hypothesize about the jurors' thought processes in order to divine the "real possibility" that a compromise verdict occurred. The inquiry, therefore, still involves an underlying assumption that jury members failed to follow their instructions and compromised their verdict. That assumption is antithetical to the most basic assumption that a jury follows the charges given to it by the court. *See Loftin, supra,* 146 *N.J.* at 390, 680 *A.*2d 677. Indeed, an acquittal on a greater charge that is unsupported by evidence is itself a clear indication that a jury properly has discharged its duties.

Moreover, it also is wasteful of judicial resources to have appellate courts attempting to second-guess what may have transpired during jury deliberations. And, it is wasteful of the trial court's time if perfectly sound jury verdicts, supported by sufficient evidence, are overturned based on speculation of a compromise verdict. The loose standard of a "real possibility" of harm only makes this test for prejudice less workable. Its low bar discourages any rigorous review for actual prejudice.

Last, the *Christener* standard is inconsistent with appellate review standards generally. *See R.* 2:10–2. Our reluctance to have reviewing courts engage in speculation about a jury's deliberative thought process has led to the entirely different approach taken in respect of review of inconsistent verdicts. *See State v. Williams,* 190 *N.J.* 114, 131 n. 8, 919 *A.*2d 90 (2007); *see also State v. Banko,* 182 *N.J.* 44, 53–56, 861 *A.*2d 110 (2004) (detailing reasons for permitting inconsistent verdicts). In *Banko, supra,* this Court reaffirmed that, absent an incomplete or misleading jury instruction, there is to be no speculation on the reasons for a jury's verdict. 182 *N.J.* at 53–56, 861 *A.*2d 110. Rather, a reviewing court need only satisfy itself that there is sufficient evidence to support the charge for which the defendant is convict-

ed. *Id.* at 56, 861 *A*.2d 110; *see also State v. Grunow,* 102 *N.J.* 133, 148, 506 *A*.2d 708 (1986) (citing "tradition of the common law" that "does not permit us to speculate upon the foundations of a jury verdict").

As the above shortcomings of the *Christener* standard reflect, the rule is difficult in application, unreliable in result, and inefficient for our trial system. We are hard pressed to see any benefit from continuation of a standard that suffers from so many weaknesses and that is inconsistent with the Court Rule generally governing appellate review of trial error, *Rule* 2:10–2. The Court Rule's standard for review of trial error is applicable for all other non-constitutional trial errors. The "real possibility" test inequitably permits the application of an incongruent, lesser standard for reversible error than the "unjust result" rule of *Rule* 2:10–2.

The inequity of such results has convinced at least one modern Supreme Court to reject its own earlier case law that, like this state, had followed a rule of presuming prejudice by the possibility of a compromise verdict. *See People v. Graves,* 458 *Mich.* 476, 581 *N.W.*2d 229, 231, 235 (1998) (adopting standard consistent with modern harmless-error jurisprudence). As the Michigan Supreme Court expressly recognized, the approach that was taken in this state with the *Christener* decision is the clear minority view. *Id.* at 233. The majority of jurisdictions hold that a jury overcharge amounts to harmless error. *See, e.g., Ricketts v. State,* 254 *Ark.* 409, 494 *S.W.*2d 462, 469 (1973) (explaining that even if overcharge occurred, defendant did not suffer prejudice because jury convicted defendant of second-degree murder); *Garcia v. United States,* 848 *A*.2d 600, 602 (D.C.2004) (embracing *Graves* analysis and majority view, stating "[o]ur faith in the jury system would be senseless indeed if we presumed that jurors will be misled by the mere presence of a charge for which sufficient evidence is wanting"); *State v. Strong,* 339 *S.W.*2d 759, 765 (Mo.1960) ("A defendant who has been convicted only of murder in the second degree may not successfully urge error in the giving of an instruction on murder in the first degree, even if the instruction is not sufficient-

ly supported by evidence."); *State v. Clark*, 175 *W.Va.* 58, 331 *S.E.*2d 496, 501 (1985) (noting that vast number of jurisdictions reject principle that reversible error exists when overcharge is given); *see also* Milton Roberts, Annotation, *Modern Status of Law Regarding Cure of Error, in Instruction as to One Offense, by Conviction of Higher or Lesser Offense*, 15 *A.L.R.*4th 118, §§ 21–24 (1982).

Clearly, the *Christener* standard is less stringent than the "unjust result" standard of review under *Rule* 2:10–2. Very likely, few jury-overcharge cases would meet the "unjust result" standard for error because a party must present cognizable evidence that an error occurred.[2] The *Christener* standard allows a defendant to bypass that standard by encouraging a reviewing court to speculate on the jury's thinking. For the reasons already discussed, we hold that overcharging errors, like other non-constitutional trial court errors such as defects in charging and the like, should be subjected on appeal to the same "unjust result" standard established in *Rule* 2:10–2. We therefore reject the continued use of the *Christener* standard in connection with claims of jury overcharge.

## V.

The judgment of the Appellate Division is reversed and the matter shall be remanded for reinstatement of defendant's conviction for aggravated manslaughter.[3]

---

[2] That is not to say that a defendant claiming jury overcharge and convicted on a lesser-included charge is incapable of demonstrating that the overcharge led to an unjust result. By way of example, a defendant claiming jury overcharge could demonstrate harmful error if evidence that would have been inadmissible in respect of the lesser-included charge on which defendant was convicted was admitted because of the overcharge.

[3] Defendant filed a protective cross-petition, preserving his sentencing issues that had not been reached by the Appellate Division due to the panel's disposition. In light of our decision today, defendant's cross-petition is granted and we remand to the Appellate Division for its consideration of the preserved issues.

Justice WALLACE, JR., concurring.

I concur in the result. In a very clear fashion, the majority appropriately concludes that "the evidence produced overall by the State was sufficient to survive a motion for acquittal on the charge of murder," *ante* at 412, 939 *A*.2d at 789, and remands for reinstatement of defendant's conviction of the lesser included offense of aggravated manslaughter, *ante* at 416–17, 939 *A*.2d at 792. That should end the case.

Whatever shortcomings some members of the Court view in Justice Pashman's opinion in *State v. Christener*, 71 *N.J.* 55, 362 *A*.2d 1153 (1976), our conclusion that there was no error in submitting the murder charge to the jury eliminated the need to reexamine *Christener*. We should not decide issues that are rendered moot by our holding. In my view, we should wait until the issue is ripe.

Justice HOENS joins in this concurrence.

*For reversal and remandment and reinstatement*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.