RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-2594-14T4

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

PORFIRIO A. NUNEZ-MOSQUEA,

 Defendant-Appellant.
____________________________

 Submitted March 29, 2017 – Decided August 24, 2017

 Before Judges Accurso, Manahan and Lisa.

 On appeal from Superior Court of New Jersey,
 Law Division, Middlesex County, Indictment
 Nos. 12-08-1139 and 12-08-1142.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Brian P. Keenan, Assistant
 Deputy Public Defender, of counsel and on
 the brief).

 Andrew C. Carey, Middlesex County
 Prosecutor, attorney for respondent (Joie
 Piderit, Assistant Prosecutor, of counsel
 and on the brief).

 Appellant filed a pro se supplemental brief.

PER CURIAM
 On March 30, 2012, twenty-year-old Y.S. was walking in

downtown New Brunswick to catch a bus for work, when a man,

later identified as defendant Porfirio A. Nunez-Mosquea,

approached her with a gun and forced her into his van. Although

it was only a few minutes after 6:00 a.m., two witnesses saw the

struggle and called the police. One of the witnesses reported

seeing a Hispanic or light-skinned black male, aged nineteen to

twenty, wearing a pullover polo shirt and jeans, wrestling with

a young, Muslim woman, whom the witness recognized from her

morning routine. The other saw the man forcing the woman

through the sliding door of a red minivan, and managed to

glimpse the first three characters of the license plate, "G40."

 Y.S. testified at trial that after forcing her into his

van, defendant drove her at gunpoint to a house not far away.

On the way, defendant told her that her cousin paid him to do

it, and he would shoot her if she screamed or did "anything

crazy." Y.S., a recent immigrant from Egypt, told him she had

no cousins, although that statement was not true. When

defendant directed her to get out of the van, still at gunpoint,

he told her not to do anything that would draw attention to the

two of them. Y.S. did as she was told, leaving her purse but

taking her phone, a white iPhone in a pink bunny case.

 2 A-2594-14T4
 Defendant led her to a dark basement where he made her

kneel on the floor facing a wall. After directing her to remove

her headscarf, defendant tightly tied Y.S.'s hands behind her

back with it. He gagged and blindfolded her and used scissors

to cut through the tank top she was wearing underneath her

cardigan. He touched her breasts underneath her bra, and made

her stand as he pulled her jeans, leggings and underwear down

below her knees. He told her he wanted to take pictures of her

to embarrass her.

 When she was again made to kneel on the floor, she heard

plastic ripping and a zipper, leading her to think he was

putting on a condom. When defendant made her stand again and

touched her vagina, she began to scream uncontrollably.

Defendant came from behind her, putting his hand over her gagged

mouth and holding a gun to her head. She scratched at his

thighs and felt his penis through the condom. When she would

not stop screaming, defendant placed a heavy plastic bag over

her head and held it against her mouth, preventing her from

breathing.

 Defendant kicked at her feet, making her fall to the floor

on her back. He had one hand between her legs and was using the

other one to hold her down. She testified the bag was still on

her head, making it impossible to breathe, but she was so scared

 3 A-2594-14T4
she could not stop screaming even as he threatened to kill her.

She testified she was choking and started to kick her feet in an

effort to get air. When she could finally get herself to stop

screaming, defendant removed the bag from her head. Saying he

needed to wash her hands because she had scratched him with her

nails, he walked her to a sink in another room.

 As he sprayed something on her hands, still tied behind her

back, and brushed her nails, he asked her if there was a reason

she could not have sex with him. She told him she could not

have sex before marriage, that her family would kill her, and

that he would ruin her whole future. He responded that he would

have to "pass [her] out so he could have sex with [her]." She

testified that she "started saying no, please no, please," and

started screaming again.

 He told her to calm down and led her back to kneel again on

the floor, and said, "let me go talk to him. . . . I'll be

back." When defendant returned, he told her "he wants to jerk

off." Y.S. did not understand. When defendant explained, she

started screaming again. He told her to stop and that he would

"talk to him." Defendant again left the room briefly. When he

returned, he told Y.S. he was "trying to make him let [her] go,"

and that defendant "didn't know he's such a psycho." Defendant

told her he was trying to "get [her] out of [there]" and asked

 4 A-2594-14T4
if she trusted him. Believing that defendant might let her go,

she told him she trusted him and asked him to help her.

 After several more rounds of defendant leaving and coming

back, he told her he was going to let her go. He pulled up her

pants and tried to cover her with her scarf and what remained of

her shirt. He untied her and removed her gag and blindfold. As

he led her out, she looked at him. Still holding the gun, he

told her not to look at him, and that there were "five other

guys out there" that would shoot her if she did anything. He

walked her up the stairs and down the street and left her,

telling her not to look back.

 Y.S. ran into the nearest business and asked the woman

behind the counter to call the police. The 911 call was played

for the jury and the prosecutor played it again during her

summation. When the police arrived, Y.S. walked them back to

the place she believed she was held captive, where they

recovered her headband, condom wrappers, the plastic bag

defendant put over her head, as well as scissors and a rag. The

owner of the house advised that defendant had lived in the

basement and still had keys.

 Going to defendant's new address, the police found a maroon

dodge Caravan outside with a license plate beginning "G40."

Looking through the window, they saw a woman's handbag, later

 5 A-2594-14T4
identified as belonging to Y.S. Defendant was sleeping naked

when the police roused him. When he got out of the bed,

officers noticed scratches on both his thighs. DNA recovered

from under Y.S.'s nails revealed that defendant and his paternal

male relatives could not be excluded as possible contributors to

the sample.

 From defendant's apartment and van, police recovered a blue

shirt, jeans and a striped jacket that Y.S. identified as the

same ones worn by her attacker, as well as her purse, her

college I.D., and her iPhone and bunny case. They also

recovered a gun, which defendant's stepfather identified as one

stolen from him a few weeks earlier. Although Y.S. identified

her attacker's clothes and identified defendant as her attacker

at trial, she did not pick him out of a photo array shortly

after his arrest.

 Y.S. was examined by a Sexual Assault Response Team

Coordinator, who testified at trial that Y.S. reported

"headache, body ache, upper arms and shoulders and left inner

aspect of the left elbow, pain." The witness testified she

found dried blood on Y.S.'s headscarf and injuries in her mouth,

on her face, wrist and elbow:

 [T]he inner aspect of her — her left upper
 cheek was cut. She had dried blood on the
 crack where the upper lip meets the lower

 6 A-2594-14T4
 lip and she had an abrasion on her lip. And
 then she had stated that her hands were
 bound behind her back and there was a,
 approximately a half a centimeter red
 scratch on her right, right wrist.

 A bruise the size of about a quarter which
 was . . . purple and that's where she
 had — was complaining that she had pain
 prior in the report. . . . The inner aspect
 of the left elbow.

 Y.S. testified to those physical injuries and to a bruise

on her back from when defendant made her fall. She also

described the emotional harm she suffered as well.1 When asked

how her abduction and assault made her feel, she responded that

she "thought [she] was going to die."

 I felt insecure, helpless. I wasn't in
 control of myself or anything. It affected
 my relationship with my parents. I thought
 I was going to die. I'm so unconfident. I
 just — weak. I can't focus at school. I —
 I can't concentrate, and that's not me.
 I'm, like, a good student. It's affected me
 — it's affected my entire life. I don't
 feel like I'm the same person.

 At the charge conference, defendant requested a

modification of the model charge for first-degree kidnapping.

Relying on State v. Sherman, 367 N.J. Super. 324 (App. Div.),

certif. denied, 180 N.J. 356 (2004), overruled in part on other

1
 The trial judge excluded the State's evidence that Y.S. was
taking prescribed anti-depressant and anti-anxiety medications
because the information had not been provided to defense counsel
in advance of trial.

 7 A-2594-14T4
grounds, State v. Dalziel, 182 N.J. 494, 504 (2005), defendant

requested the court modify the model charge to distinguish

between the type of harm occurring in every kidnapping from the

harm the State must prove to secure a conviction. He asked that

the charge include that "minimal or insubstantial injuries are

insufficient to establish physical harm. The harm component

must be distinguished from the type of harm inherent in every

kidnapping. Inherent means involved in the essential character

of something." Defendant contended that language in Sherman

acknowledged a difference between emotional and psychological

harm sufficient to satisfy the statute and "the type of harm

inherent in every kidnapping," he argued that distinction should

apply to all harm, not merely psychological harm.

 Judge Pincus denied the request, finding a defendant is

entitled to a jury instruction on first-degree kidnapping that

makes clear the State is required to prove the defendant

knowingly caused emotional, physical, or psychological harm, or

knowingly released the victim in an unsafe place, but is not

"entitled to an instruction that the harm component must be

distinctive from the kind of harm inherent in every kidnapping."

The judge accordingly delivered the model charge on first-degree

kidnapping in effect at the time of trial, with no alterations.

 8 A-2594-14T4
 The jury convicted defendant of two counts of first-degree

kidnapping, N.J.S.A. 2C:13-1b; second-degree attempted

aggravated sexual assault, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:14-

2a; third-degree attempted aggravated criminal sexual contact,

N.J.S.A. 2C:5-1 and N.J.S.A. 2C:14-3a; third-degree terroristic

threats, N.J.S.A. 2C:12-3b; second-degree possession of a weapon

for an unlawful purpose, N.J.S.A. 2C:39-4a; second-degree

unlawful possession of a weapon, N.J.S.A. 2C:39-5b; and third-

degree criminal restraint, N.J.S.A. 2C:13-2. The jury acquitted

him of attempted murder, two counts of invasion of privacy and

receiving stolen property. Following the verdict, defendant

pled guilty to a second-degree certain persons offense, N.J.S.A.

2C:39-7b, charged in a separate indictment. As to the "unharmed

release" element of first-degree kidnapping, the jury found

defendant released Y.S. in a safe place prior to apprehension,

but also found he knowingly harmed her.

 Defendant moved for a new trial, arguing he was entitled to

the modification to the instruction on kidnapping he had

requested, and that the State had failed to prove the "unharmed

release" element elevating kidnapping to a first-degree offense.

Judge Pincus denied the motion. She found:

 In this case, Y.S. was removed from the
 street at gun point by defendant, who was a
 stranger. Brought to the basement of an

 9 A-2594-14T4
unknown isolated residence. Bound, gagged
and blindfolded. Had her clothes ripped
off, her breasts and vaginal region touched,
and was threatened with a gun throughout the
course of this ordeal.

 Y.S., fearing that defendant was about
to sexually assault her as a result of
hearing him unzip his pants and rip open a
condom, began to scream. To stop her from
screaming, defendant took a thick plastic
bag, put it over her head with his hand on
top of the portion of the bag that was over
her mouth so that she could not breathe.

 He continued to tell her to stop
screaming, and when she did not comply he
kicked her feet out from under her which
caused her to fall on her back. The plastic
bag was still on her head and defendant’s
hand was between her legs as he held her
down.

 Y.S. was kicking and screaming because
she could not breathe. She – there was
blood on the area of her head as a result of
being – as a result of the defendant's
actions, and she suffered other injuries,
including cuts to her mouth and wrist, and
bruises to her elbow.

 The defendant argues that Y.S. suffered
only minimal and insubstantial injuries . .
. . And just to be clear, the defendant's
argument that she suffered only minimal and
insubstantial injuries which would be
insufficient to prove physical harm is
clearly contradicted by those facts.

 Y.S.'s injuries were neither minimal
nor insubstantial. Clearly, based on these
facts, the jury could have found that Y.S.
suffered physical injuries which would
satisfy the element of first-degree

 10 A-2594-14T4
 kidnapping in that Y.S. was not released
 unharmed.

 The judge distinguished a recent unpublished decision from

our court in which we held the testimony regarding the victim's

emotional state following the defendant's confinement of her in

her own apartment was insufficient evidence of harm to support

defendant's conviction for first-degree kidnapping. In that

case, Judge Pincus noted

 the victim knew the defendant and did not
 suffer any physical injuries whatsoever.
 While in our case the defendant, who was a
 stranger to Y.S. and a situation in which
 Y.S. was physically harmed, in that she was
 bound, gagged, blindfolded, suffocated,
 smothered, kicked, had cuts on her mouth and
 wrist, scratches on her hand, bruises to her
 elbow and back, and was knocked to the
 ground, and there was bleeding in the area
 of her head.

 There is no requirement that the State
 prove Y.S's injuries through medical
 evidence. And the jury could have
 reasonably come to the determination that
 Y.S. suffered physical harm based on her
 testimony as to what transpired during the
 kidnapping.

 Consequently there was no requirement
 for the jury to be given the instruction
 that the harm must exceed that which is
 inherent in every kidnapping. And this
 court is not addressing Y.S.'s psychological
 or emotional trauma as it is not necessary
 for the purpose of this motion, but I do
 recognize that Y.S. testified she felt like
 she was going to die. Her relationship with
 her parents suffered. She felt insecure and

 11 A-2594-14T4
 helpless. She lost her ability to
 concentrate at school.

 The judge concluded the charge both conformed to the

holding in Sherman and followed the model charge, and that the

jury applied the law as instructed and determined defendant

knowingly harmed Y.S. She found the jury's verdict finding

defendant guilty of first-degree kidnapping was not against the

weight of the evidence and did not result in a manifest denial

of justice under the law and thus denied the motion.

 Following appropriate mergers, Judge Pincus sentenced

defendant to twenty-five years in State prison for first-degree

kidnapping subject to the periods of parole ineligibility and

supervision required by the No Early Release Act (NERA),

N.J.S.A. 2C:43-7.2; to a consecutive seven-year NERA term for

second-degree attempted aggravated sexual assault subject to

parole supervision for life pursuant to N.J.S.A. 2C:43-6.4; a

concurrent seven-year term for second-degree unlawful possession

of a weapon subject to three years' parole ineligibility under

the Graves Act, N.J.S.A. 2C:43-6c; and to a consecutive seven-

year term on second-degree certain persons not to have weapons

subject to five years' parole ineligibility pursuant to N.J.S.A.

2C:39-7b.

 Defendant appeals, raising the following issues:

 12 A-2594-14T4
 POINT I

 THE TRIAL JUDGE'S ERROR IN FAILING TO
 PROPERLY INSTRUCT THE JURY ON THE HARM
 ELEMENT OF THE FIRST-DEGREE KIDNAPPING
 CHARGE DEPRIVED NUNEZ-MOSQUEA OF HIS RIGHTS
 TO A FAIR TRIAL AND DUE PROCESS.

 POINT II

 NUNEZ-MOSQUEA WAS DEPRIVED OF HIS RIGHT TO A
 FAIR TRIAL WHEN THE TRIAL JUDGE REFUSED TO
 DECLARE A MISTRIAL AFTER THE JURY TALKED,
 DURING AND AFTER DELIBERATIONS, ABOUT THE
 FACT THAT NUNEZ-MOSQUEA'S LAWYER WAS
 APPOINTED BY THE PUBLIC RATHER THAN PRIVATE,
 AND THE EXPENSE OF THE TRIAL.

 POINT III

 THE SENTENCING JUDGE ERRED IN APPLYING
 AGGRAVATING TWO BY DOUBLE COUNTING THE HARM
 THAT ELEVATED THE KIDNAPPING OFFENSE TO THE
 FIRST-DEGREE LEVEL, RESULTING IN A
 MANIFESTLY EXCESSIVE TWENTY-FIVE-YEAR NERA
 TERM.

He adds the following points in a pro se brief.

 POINT I

 APPELLANT WAS DEPRIVED OF DUE PROCESS OF LAW
 AND FAIR TRIAL GUARANTEED BY THE FIFTH,
 SIX[TH] AND FOURTEENTH AMENDMENT TO THE
 UNITED STATES CONSTITUTION, WHEREBY, THE
 TRIAL COURT FAILED TO PROVIDE THE JURY WITH
 A COMPLETE IDENTIFICATION CHARGE.
 SPECIFICALLY, THE CROSS-RACIAL
 IDENTIFICATION LACKED THE MOST ESSENTIAL
 COMPONENTS OF THE STANDARD MODEL CHARGE.

 POINT II

 APPELLANT WAS DEPRIVED OF DUE PROCESS OF LAW
 AND FAIR TRIAL GUARANTEED BY THE FIFTH,

 13 A-2594-14T4
 SIX[TH] AND FOURTEENTH AMENDMENT TO THE
 UNITED STATES CONSTITUTION, WHEREBY, STATE
 FAILED TO PROVE CRITICAL ELEMENT OF "SEXUAL
 PENETRATION" REQUIRED BY THE CHARGE OF
 SECOND-DEGREE ATTEMPTED AGGRAVATED ASSAULT
 PURSUANT TO N.J.S.A. 2C:5-1 AND N.J.S.A.
 2C:14-2A COUNT FOUR.

 POINT III

 IMPOSITION OF DEFENDANT'S SENTENCES BEYOND
 THE STATUTORY MAXIMUM BASED ON JUDICIAL
 FACT-FINDING OF AGGRAVATING FACTOR WHICH WAS
 NEVER ADMITTED TO BY DEFENDANT OR SUBMITTED
 TO A JURY AND PROVED BEYOND A REASONABLE
 DOUBT VIOLATED BOTH HIS STATE AND FEDERAL
 CONSTITUTIONAL RIGHTS.

 POINT IV

 THE CUMULATIVE EFFECT OF THE ERRORS
 COMPLAINED OF RENDERED THE TRIAL UNFAIR.

Having considered defendant's arguments in light of the facts

and the applicable law, we affirm.

 The grading provision of the kidnapping statute, N.J.S.A.

2C:13-1c(1), provides, as pertinent here, that "kidnapping is a

crime of the first degree . . . [but i]f the actor releases the

victim unharmed and in a safe place prior to apprehension, it is

a crime of the second degree." There is no question but that

harming or failing to release the victim is an element the State

must prove in order to secure a conviction for first-degree

kidnapping. State v. Federico, 103 N.J. 169, 174 (1986); State

 14 A-2594-14T4
v. Casilla, 362 N.J. Super. 554, 566-67 (App. Div.), certif.

denied, 178 N.J. 251 (2003).

 We construed the "unharmed release" provision in Sherman, a

case involving the kidnapping of a six-year-old child for

ransom. 367 N.J. Super. at 332. After abducting the child and

holding her at his mother's home for nearly twenty-four hours,

where he built her a "fort" from cushions, fed her Cheerios,

yogurt and apple juice, let her watch cartoons and provided her

with a book and a game when he left her alone for ten minutes to

make a ransom call, the defendant had a change of heart and

decided to return the child to her parents. Id. at 332-33. He

dropped her at a shopping mall shortly after it opened with

instructions "to run to the first adults she saw and tell them

the police were looking for her." Id. at 333.

 The child quickly happened upon a school teacher, who

reported her as "composed and not in any distress." Ibid.

Although an examination of the child revealed her "in good

condition, with no sign of physical injury or emotional

distress," and she reported that "the man that took her treated

her nicely," she subsequently experienced nightmares, anxiety,

and a fear of again being kidnapped and was diagnosed with post-

traumatic stress disorder. Id. at 333-34.

 15 A-2594-14T4
 Although we reversed the defendant's first-degree

kidnapping conviction, based on the denial of his in limine

motion to modify the jury charge to reflect the State's

obligation to prove unharmed release beyond a reasonable doubt,

we rejected his argument that the child's anxiety, nightmares

and fear constituted only minimal emotional or psychological

harm insufficient to support first-degree kidnapping. Id. at

330-31, 342. We held that the "harm" in the unharmed release

provision of N.J.S.A. 2C:13-1c, includes emotional or

psychological harm suffered by the victim. Id. at 330. We also

held that "disproving unharmed release is a 'material' element

of the crime of first-degree kidnapping, requiring the State to

prove that a defendant 'knowingly' harmed or 'knowingly'

released the victim in an unsafe place." Ibid. We concluded

that

 the "harm" component of the unharmed release
 provision contained in N.J.S.A. 2C:13-1c
 focuses on the conduct of the kidnapper
 during the purposeful removal and holding or
 confining of the victim, as distinguished
 from the type of harm inherent in every
 kidnapping. Therefore, when a victim is
 released in a safe place prior to the
 kidnapper's apprehension, as [in Sherman],
 in order to prove that the kidnapper is
 guilty of first-degree kidnapping, the State
 must prove beyond a reasonable doubt that
 the kidnapper knowingly caused physical,
 emotional or psychological harm to the
 victim.

 16 A-2594-14T4
 [Sherman, supra, 367 N.J. Super. at 330-31.]

 In reaching that conclusion in Sherman, we relied on our

opinion in State v. Tronchin, 223 N.J. Super. 586, 594 (App.

Div. 1988), a case involving the sexual assault of a woman who

had voluntarily accepted a ride from the defendant. Although

finding the State did not prove kidnapping in that case as the

victim was neither "confined" nor "removed," we soundly rejected

the notion that the victim of a second-degree sexual assault

"suffered neither physical nor emotional injury, and was thus

released unharmed, N.J.S.A. 2C:13-1c(1)." Id. at 594 n.4.

 Following our opinion in Sherman, the model charge for

first-degree kidnapping was amended to provide that the State

must prove the defendant "knowingly harmed" or "knowingly did

not release" the victim in a safe place prior to his

apprehension and that "[t]he 'harm' component can include

physical, emotional, or psychological harm." See Model Jury

Charge (Criminal), "Kidnapping – Permanent Deprivation of

Custody" (March 5, 2007). In accordance with the model charge,

the trial court instructed the jury as follows:

 If you find that the State has proven
 to you beyond a reasonable doubt that the
 defendant committed the crime of kidnapping,
 you must go on to determine whether the
 State has also proven beyond a reasonable
 doubt that the defendant knowingly harmed

 17 A-2594-14T4
 [Y.S.], or knowingly did not release her in
 a safe place prior to apprehension.

 The harm component can include
 physical, emotional, or psychological harm.
 In this case, the State alleges that
 defendant bound, gagged, smothered, held a
 gun to [Y.S.'s] head, and attempted to
 sexually assault her. In the course of
 doing so[,] defendant caused cuts to her
 mouth, wrist, and bruises to her elbow. The
 State alleges that [Y.S.] was traumatized as
 a result of these crimes.

 On the other hand, defendant contends
 that he did not knowingly cause harm to
 [Y.S.], and that she was released in a safe
 place, a residential street, in daylight.

 Several months after the trial, the model charge for first-

degree kidnapping was again revised with regard to what the

State must prove when alleging non-physical harm as follows:

 If the State is contending that the victim
 suffered emotional or psychological harm, it
 must prove that the victim suffered
 emotional or psychological harm beyond that
 inherent in a kidnapping. That is, it must
 prove that the victim suffered substantial
 or enduring emotional or psychological harm.

 [Model Jury Charge (Criminal), "Kidnapping"
 (revised Oct. 6, 2014).]

 Defendant, however, did not request a modification of the

charge as it related to the victim's psychological injuries. He

maintained he was entitled to a charge instructing the jury that

"minimal or insubstantial injuries are insufficient to establish

physical harm" and that "[t]he harm component must be

 18 A-2594-14T4
distinguished from the type of harm inherent in every

kidnapping."

 No New Jersey case of which we are aware has ever suggested

that there is a difference between the physical harm sufficient

to satisfy the released unharmed provision of the statute and

"the type of harm inherent in every kidnapping."2 Moreover,

2
 The Supreme Court has previously rejected reliance on the
comments of the Criminal Law Revision Commission on which
defendant relies, proposing "to maximize the kidnapper's
incentive to return the victim alive, by making first degree
penalties apply only when the victim is not 'released alive in a
safe place.'" State v. Masino, 94 N.J. 436, 446 (1983).

 Any argument that our legislature intended
 to soften its treatment of kidnappers is
 foreclosed by reference to an early draft of
 2C:13-1, subsequently rejected, that
 discussed a downgrading provision: "We
 propose to maximize the kidnapper's
 incentive to return the victim alive by
 making first degree penalties apply only
 when the victim is not 'released alive in a
 safe place' . . . . Certainly those
 formulations which authorize extreme
 penalties unless the victim is 'liberated
 unharmed' are unsatisfactory . . . ."
 [Final Report of the New Jersey Criminal Law
 Revision Commission, vol. II: Commentary
 (1971) at 187] (emphasis added). As it
 turned out, of course, the legislature did
 ultimately authorize first degree sentences
 of 15 to 30 years unless the victim was
 released unharmed. N.J.S.A. 2C:13-1(c).

 [Ibid.]

The Sherman court likewise rejected any argument that by
employing the word "unharmed" the Legislature intended it "to

 19 A-2594-14T4
while we accept that "[i]t may be possible that some types of

injury would be of such trifling nature as to be excluded from

the category of injuries which [the Legislature] had in mind,"

Robinson v. United States, 324 U.S. 282, 285, 65 S. Ct. 666,

668, 89 L. Ed. 944, 946-47 (1945), the harm inflicted on Y.S.,

whom the court aptly described as having been "bound, gagged,

blindfolded, suffocated, smothered, [and] kicked" to the ground

in the course of an attempted aggravated criminal sexual contact

and attempted aggravated sexual assault, resulting in "cuts on

her mouth and wrist, scratches on her hand, [and] bruises to her

elbow and back," plainly was not of that trifling character.

See Tronchin, supra, 223 N.J. Super. at 594 n.4.

 Likewise, we do not fault the trial judge for not modifying

the charge regarding emotional harm sua sponte in anticipation

of the revision adopted several months after the trial. That

revision, although apparently based on Sherman, was not made for

ten years following our opinion in that case. More important,

the error, if there was one, was undoubtedly harmless as there

was ample evidence on this record to permit the jury to find

mean only that the victim suffered no bodily injury or no
serious bodily injury." 367 N.J. Super. at 343-44; see also
State v. Sewell, 127 N.J. 133, 135-36 (1992) (including in
"bodily injury" as defined in N.J.S.A. 2C:11-1, a sore leg,
back, hip, and chest with no bruising, and briefly elevated
blood pressure induced by collision with a fleeing thief).

 20 A-2594-14T4
beyond a reasonable doubt that defendant knowingly inflicted

physical harm on Y.S. in the course of the kidnapping.

 Defendant's argument with regard to alleged jury misconduct

warrants no discussion here. R. 2:11-3(e)(1)(E). The comments

by a single juror speculating on whether defendant was

represented by private counsel or the public defender were

promptly and appropriately addressed by the trial judge. The

judge questioned each juror individually as to whether the juror

recalled a conversation about "appointed attorneys versus

private attorneys" and instructed all who heard such comments

that the comments must play no role in their deliberations. The

jurors advised the judge they could follow her direction.

 Judge Pincus proceeded in this matter exactly as the

Supreme Court directed in State v. R.D., 169 N.J. 551, 557-61

(2001). Her conclusion that the remarks were no more than "a

passing comment" having no effect on the jury's deliberations is

supported by the record and thus entitled to our deference. Id.

at 559. Defendant's contention that the remarks entitled him to

a mistrial are without merit.

 We also reject defendant's argument that the trial judge

double counted in applying aggravating factor two, resulting in

a manifestly excessive twenty-five-year NERA term on the

kidnapping count. N.J.S.A. 2C:13-1c(1) provides the sentencing

 21 A-2594-14T4
court discretion to sentence a defendant to between fifteen and

thirty years for first-degree kidnapping. State v. Megargel,

143 N.J. 484, 505 (1996). Although acknowledging that "factors

one and two are not easily found," Judge Pincus concluded that

"this is the case for which they are appropriate."

 Specifically, the judge reasoned that factor one applied

because the kidnapping

 was committed in an especially heinous,
 cruel or depraved manner, in that Defendant
 did not only abduct the victim at gunpoint
 and take her to a deserted basement
 apartment where he threatened to kill her,
 but he did much more than that . . . .

 He told her that her cousin was the
 mastermind and there was a man directing
 what he was doing in the other room. And
 that that man wanted him to do sexual things
 to Y.S. He tied her hands behind her back,
 blindfolded her, gagged her, put a bag over
 her head choking and smothering her to stop
 her from screaming. He attempted to
 sexually assault her and continued to tell
 her that other men were involved and wanted
 to touch her.

 All of these circumstances increased
 her terror and went well beyond what was
 necessary to accomplish the kidnapping.

 As to factor two, the judge explained that:

 Factor two has to do with the gravity
 and seriousness of the harm inflicted on the
 victim. And in this case the defendant
 terrorized the victim from the moment that
 he grabbed her off the street at gunpoint,
 brought her to an isolated basement

 22 A-2594-14T4
 apartment at gunpoint. Blindfold, gagging,
 tying her hands, smothering her.

 She described the harm that was
 inflicted on her [in her victim impact
 statement]. And here it is appropriate to
 talk about the emotional harm. And in this
 case in particular, any person would be
 unbelievably frightened by all of these
 circumstances, and especially that part of
 the crime that had to do with attempting to
 sexually assault her by cutting her clothes,
 taking her clothes off, hearing him unzip
 his pants, put on a condom, all of that.

 But to this victim in particular, the
 harm was much more because she is an
 observant Muslim. And certainly described
 during the trial and today that it would not
 be acceptable for her to have a sexual
 relationship with anyone before marriage.
 And even though she was the victim here[,]
 the family is still looking at her as if in
 some way she's at fault. She's not
 permitted to talk about it, she can't talk
 to her family. She has to cry in privacy.

 And this obviously had such a
 significant impact on her that aside from
 the normal emotional trauma that would
 accompany any victim of an attempted
 aggravated sexual assault, along with the
 kidnapping and all of the other frightening
 circumstances, she has additional emotional
 harm through which she suffers and continues
 to suffer.

 "Appellate review of the length of a sentence is limited."

State v. Miller, 205 N.J. 109, 127 (2011). Although it is

axiomatic "that facts that established elements of a crime for

which a defendant is being sentenced should not be considered as

 23 A-2594-14T4
aggravating circumstances in determining that sentence," State

v. Kromphold, 162 N.J. 345, 353 (2000), "a sentencing court may

justify the application of aggravating factor one, without

double-counting, by reference to the extraordinary brutality

involved in an offense," State v. Fuentes, 217 N.J. 57, 75

(2014). Judge Pincus did so here in meticulously describing the

circumstances that increased the victim's terror "and went well

beyond what was necessary to accomplish the kidnapping."

 Although, as the judge acknowledged, finding factors one

and two are far from usual, we have held that application of

both factors is not per se unreasonable. See State v. Soto,

340 N.J. Super. 47, 71-72 (App. Div.) (finding no abuse of

discretion in the trial court's application of aggravating

factors one and two in sentencing the defendant for a brutal

murder), certif. denied, 170 N.J. 209 (2001), overruled in part

on other grounds, Dalziel, supra, 182 N.J. at 504. It is well

settled that where the harm to the victim far exceeds the

minimum necessary to prove an element of the offense, the court

may treat the additional harm as an aggravating factor. State

v. Mara, 253 N.J. Super. 204, 214 (App. Div. 1992).

 Application of aggravating factor two "compels 'a pragmatic

assessment of the totality of harm inflicted by the offender on

the victim.'" State v. Anthony, 443 N.J. Super. 553, 575-76

 24 A-2594-14T4
(App. Div. 2016) (quoting State v. Lawless, 214 N.J. 594, 610

(2013)). "'It focuses on the setting of the offense itself with

particular attention to any factors that rendered the victim

vulnerable or incapable of resistance at the time of the

crime.'" Id. at 576 (quoting Lawless, supra, 214 N.J. at 611).

Here, Judge Pincus found the victim's Muslim faith, which she

made known to defendant, increased the trauma she suffered, far

exceeding that minimally necessary to elevate the crime to

first-degree kidnapping, making this kidnapping more heinous

than typical. That finding is well supported by the record.

 Because we are satisfied that Judge Pincus's careful

findings and balancing of the aggravating and non-existing

mitigating factors are supported by adequate evidence in the

record, and the sentence is neither inconsistent with sentencing

provisions of the Code of Criminal Justice nor shocking to the

judicial conscience, we affirm it in its entirety. See Fuentes,

supra, 217 N.J. at 70; State v. Bieniek, 200 N.J. 601, 608

(2010); State v. Cassady, 198 N.J. 165, 180-81 (2009).

 Defendant's remaining arguments, to the extent we have not

addressed them, lack sufficient merit to warrant discussion in a

written opinion. See R. 2:11-3(e)(1)(E).

 Affirmed.

 25 A-2594-14T4