**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4682-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DARRION K. TRENT,

     Defendant-Appellant.

_____

Submitted June 3, 2021 – Decided August 4, 2021

Before Judges Alvarez and Sumners.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 17-11-0775.

Kelly Anderson Smith, attorney for appellant.

Esther Suarez, Hudson County Prosecutor, attorney for respondent (Ednin D. Martinez, Assistant Prosecutor, on the brief).

PER CURIAM

    Tried by a jury, defendant Darrion K. Trent was convicted of first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count twelve); a lesser-included

disorderly persons simple assault, N.J.S.A. 2C:12-1(a)(1) (count thirteen); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count fourteen); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count fifteen); and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1) (count sixteen). Defendant was charged in a twenty-count superseding indictment along with four co-defendants, Maurice Miles, Tony Martinez, Kawon Robinson, and Katrell Trent. Only defendant was charged with murder. The charges against Miles were dismissed by the time of trial. Martinez, Robinson, and Trent were tried with defendant.

On May 10, 2019, the trial judge sentenced defendant to an aggregate term of thirty years, with thirty years of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. His sentence was also subject to the Graves Act, N.J.S.A. 2C:43-6(c).[1] He appeals his convictions, alleging a series of trial errors occurred. We affirm.

---

[1] All other offenses were made concurrent to the thirty-year NERA murder sentence: six months on simple assault, ten years subject to NERA on the second-degree aggravated assault, ten years on the possession of a weapon for an unlawful purpose, five of which were parole-ineligible in accord with the Graves Act, and ten years, also subject to a five-year Graves Act parole ineligibility term, on the unlawful possession of a weapon. N.J.S.A. 2C:43-6.

A-4682-18

The incident was captured by surveillance cameras at the location. On June 4, 2016, at approximately 2:30 a.m., Davon Gordon and Terrell Corbin were driving to a convenience store in Jersey City. Gordon, who was driving, stopped, spoke to a group of individuals outside of a bar, and then drove about a block away to park. As Corbin testified, when they were walking back towards the bar, a man in a red hoodie stopped and asked him if he had said something rude. The man, later identified as Katrell Trent, had a short haircut and was accompanied by four other men, including a bald man with a beard, later identified as Martinez. Corbin identified defendant sporting dreadlocks, camouflage pants, and a white t-shirt. Another, identified as Tavin Robinson, had a ponytail and white t-shirt, while Kawon Robinson wore a White Sox hat.

As Corbin continued toward the bar, he was shot on the left side of his buttocks. He saw that the man in the red hoodie was the shooter, but that the man wearing the White Sox cap also had a gun. Corbin ran into the middle of the street to get away, but the man in the red hoodie followed. There, the man with the dreadlocks, the bald man, and the man with the ponytail started throwing punches at him, slammed him onto the ground, "stomp[ed]," and kicked him.

A-4682-18

During the trial, the State played surveillance video for the jury depicting Gordon and Corbin approaching in their vehicle, parking, and then walking down the street. As the video was played for the jury, Corbin identified the four men who assaulted him. He identified himself on the video as the person wearing a white t-shirt and a blue hat.

The video showed Corbin attempting to block the blows, getting "stomped" and kicked by the bald man with the beard, "the red hoodie," the man with the dreads, and the man with the ponytail. Corbin said when he heard more gunshots, the men started to leave. He went to find Gordon, who was lying on his back between two cars. Gordon had been shot four times in the abdomen, once in his right hip, and once in his right hand. He died from his wounds several hours later.

Corbin had a prior criminal history, elicited by the prosecutor on direct. Defense counsel was prohibited from cross-examining him about the nature of the offense.

The forensic medical examiner who performed Gordon's autopsy testified on behalf of the State. He said that the bullet trajectories indicated that had Gordon been lying on his back, the shooter would have been standing at his feet

4

and slightly to the right. Additional details regarding his testimony are provided in the relevant section.

In addition to being shown the surveillance videos, the jury heard from a nearby resident who was awakened by gunshots during the early morning hours. He testified he saw people running and fighting in the street, and that there were only about three men who were actually involved in the fight, two fighting one individual. He said the fighting was intense, and that the two were brutally attacking the third. A fourth individual joined the two attackers. He described the men, including one wearing a red shirt, but could not recall if he was one of the original two men beating the third, or was the third man who joined the assault later.

According to the resident, one of the three men backed off from the assault. The resident then heard four more gunshots and the fight ended. The man in the white shirt stumbled towards a car parked near the sidewalk. Another person was lying near a car on the sidewalk, rolling back and forth after the shots had been fired. The men who had been involved in the assault fled in a black Maxima that stopped in front of the bar.

Detective Sean Patrick O'Leary of the Hudson County Prosecutor's Office testified that he responded to the crime scene at approximately 9:30 that

morning, after Gordon died. O'Leary met with Corbin, who gave a recorded statement. Detective Sherika Salmon, also of the Hudson County Prosecutor's Office, testified she too responded to the scene and recovered surveillance video from three cameras on the street.

Salmon and O'Leary interviewed Corbin a second time after the video film had been collected. He was shown still photographs drawn from them and identified the man in the red hoodie, the man wearing dreadlocks, the bald man, the man with a ponytail, and the man with a White Sox hat as having been present.

Alcee Davis was on the street when the shootings occurred. As the surveillance video was played for the jury, Davis identified himself, and the man wearing a red sweater or jacket as Trent. He testified he knew Trent casually. He identified others in the video. Davis testified he saw no one fighting, although when shown a prior statement, he acknowledged he had previously told detectives that several of the co-defendants were engaged in a fight.

Salmon took a video-recorded statement from Tavin Robinson, Kawon's brother, on June 15, 2016. Tavin testified, identifying himself in the surveillance video as wearing a white t-shirt. He heard gunshots and started

running away, but then returned because he thought his brother Kawon was still fighting. He did not recall who he had fought because he was intoxicated.

When confronted on the stand with the statement he gave Salmon, Tavin agreed that the individual with whom he was fighting wore a white shirt and had dreadlocks. The State played surveillance video of the scene, and Tavin confirmed it showed him going into the street and fighting someone in a white t-shirt. Tavin claimed he did not know who else was present.

Ultimately, the judge directed the jury out of the courtroom and conducted a Gross[2] hearing because, according to Tavin, police forced him to make the identifications, based on information rehearsed before his statement was filmed, even though he did not actually know the men involved. The court then determined the filmed interview met the standards for admission under Gross, and allowed it to be introduced as evidence, not just used for impeachment purposes. The prosecutor played the video for the jury. In the video, Tavin identified defendant.

During the trial and summation, the jury was shown the surveillance videos. We discuss counsel's argument, as well as the medical examiner's testimony, in greater detail in the relevant sections of the opinion.

---

[2] State v. Gross, 121 N.J. 1 (1990).

A-4682-18

On appeal, defendant raises the following points:

POINT I

THE TRIAL COURT FAILED TO EXCLUDE THE STATE'S EXPERT TESTIMONY UPON THE STATE'S FAILURE TO RENDER AN EXPERT REPORT.

POINT II

THE TRIAL COURT ERRED BY FAILING TO PERMIT THE DEFENSE THE OPPORTUNITY TO PROPERLY IMPEACH THE STATE'S MATERIAL WITNESS'S CREDIBILITY.

POINT III

THE STATE'S SUMMATION WAS REPLETE WITH MISCONDUCT THAT RESULTED IN IRREPARABLE HARM TO THE DEFENDANT.

POINT IV

THE TRIAL COURT'S INSUFFICIENT AND IMPROPER INSTRUCTIONS AND JURY CHARGES DENIED DEFENDANT A FAIR AND IMPARTIAL TRIAL.

A.   Defendant Was Prejudiced [A]nd Suffered Irreparable Harm When The Trial Court Consistently Failed To Provide The Jury With Timely And Sufficient Limiting Or Curative Instructions.

B.   The Jury Charges Were Insufficient And Incomplete.

A-4682-18

<u>POINT V</u>

THE CUMULATIVE ERRORS COMMITTED BY THE TRIAL COURT DENIED THE DEFENDANT A FAIR TRIAL AND RESULTED IN A MANIFEST INJUSTICE.

I.

Defendant contends on appeal that the trial court erred by allowing the medical examiner to opine as to where the shooter was standing when he pulled the trigger based on the trajectory of the bullets. Defendant argues that the testimony should have been submitted in writing in accord with the State's discovery obligations. He further asserts that during the grand jury presentation, the State presented the testimony of an officer who met with the medical examiner, which resulted in the grand jury decision to indict a different person for murder—defendant, not Miles. That crucial decision, based on the medical examiner's conclusion as to where the shooter stood, should have required the State to provide a supplemental report.

Defendant filed a motion prior to trial to bar the medical examiner's testimony for the same reasons. The trial court found, however, that the argument relied on a mischaracterization of the report. The medical examiner's opinion regarding the trajectory of the bullet after entry into the body never

9

changed and was included in the written report. As a result, no second written report was required.

At trial, the medical examiner testified in conformance with his written report. He said three bullets entered the body from the front, in an upwards direction from the feet, from right to left. He recovered those bullets. The autopsy revealed an additional three bullet wounds from bullets that also entered Gordon's body from the front.

At trial, on direct examination, the medical examiner testified as follows:

> Q. Now if someone -- where did the shots come from with [respect to] Mr. Gordon's body, in front of him or behind him?
>
> A. In front of him.
>
> Q. Okay. And if Mr. Gordon was lying on the ground at the time he was shot, did the shots come from above his head or below his feet?
>
> A. Should be coming from below his feet.
>
> Q. Now what makes you think that they came from below his feet.
>
> A. Because the wound direction.
>
> Q. You're talking specifically with [regard to] the fact they all went up, is that right?
>
> A. Correct.

10

Q.     Now with regard[] to, I think some of them you mentioned went from right to left and then it was slightly right to left and then that dropped down, is that right?

A.     Correct.

Q.     What if anything can you tell us as to where the shooter was standing in my hypothetical when the person is lying on the ground.  Were they to the right, the left, or you don't know?

Defense counsel objected, the objection was overruled, and the prosecutor then continued as follows:

Q.     So again in my hypothetical[,] if Mr. Gordon was lying on the ground face up at the time he was shot, can you tell us where the shooter would be, where the shots would be fired from, right or left of his body?

A.     If, like you said, it's facing up without turning, then most probably it's slightly towards the right side of the decedent.

Q.     Why do you say most probably as opposed to . . . giving us certainty?

A.     Well . . . if it's strictly the body was facing up with the torso facing up, then I have to say with a certainty, very certain, yeah.

We review a trial court's evidentiary rulings for abuse of discretion.  State v. Buda, 195 N.J. 278, 294 (2008).  Furthermore, "[a] trial court's resolution of a discovery issue is entitled to substantial deference . . . ."  State v. Stein, 225

N.J. 582, 593 (2016). A defendant is entitled to broad discovery, and with regard to expert testimony, the rule parallels that required in civil matters. See id. at 594; State v. Campione, 462 N.J. Super. 466, 506 (App. Div. 2020) (quoting State v. LaBrutto, 114 N.J. 187, 205 (1989)).

"Under Rule 3:13-3(b)(1)(I), '[f]actors that should result in permitting the expert to testify include "(1) the absence of any design to mislead, (2) the absence of the element of surprise if the evidence is admitted and (3) the absence of prejudice which would result from the admission of evidence."'" State v. Washington, 453 N.J. Super. 164, 191 (App. Div. 2018) (alteration in original) (quoting LaBrutto, 114 N.J. at 205). In this context, prejudice "refers not to the impact of the testimony itself, but the aggrieved party's inability to contest the testimony because of late notice." Ibid. (quoting State v. Heisler, 422 N.J. Super. 399, 415 (App. Div. 2011)).

The medical examiner's testimony included, as did the report, the description of the bullet wounds and bullet trajectories, information gathered during the autopsy. Even if the State's interpretation of those findings changed as the investigation progressed, the underlying observations did not.

Prosecutors are permitted to pose hypotheticals to expert witnesses; defense counsel is then permitted to cross-examine as to those hypotheticals.

12

See State v. Martini, 131 N.J. 176, 259 (1993) ("After an expert witness has given his [or her] opinion in response to a hypothetical question, his [or her] opponent is permitted on cross-examination to supply omitted facts and ask the expert if his or her opinion would be changed based on the new information."). Defense counsel thoroughly cross-examined the medical examiner.

Absent from the record is any indication that the State intended to mislead, surprise, or prejudice defendant with the medical examiner's testimony. Defendant was aware of the proposed testimony and filed a pretrial motion to suppress it. Defense counsel posed hypotheticals of their own to the witness. Under these circumstances, there was no need for any supplemental written report. See Washington, 453 N.J. Super. at 191. It was not abuse of discretion for the court to have admitted the testimony. The jury was given the expert testimony model jury charge, Model Jury Charges (Criminal), "Expert Testimony" (rev. Nov. 10, 2013), which instructs that they can accept all or only a portion of the expert's testimony—or that they can reject all of it.

II.

Defendant further contends the trial court erred by refusing to allow defense counsel to cross-examine Corbin about the nature of his nine-year-old conviction. During the direct examination, the State elicited from Corbin that

13

he was convicted of a second-degree crime on April 1, 2010, and had been sentenced to seven years subject to eighty-five percent parole ineligibility. Defendant theorizes that being permitted to specify the crime would have revealed a motive for Corbin to lie, since he would then have been able to argue to the jury that Corbin could have had his parole revoked if he violated parole supervision.

The record establishes, however, that a co-defendant's attorney did ask Corbin about the fact he was on parole, which Corbin admitted. Corbin said he did tell the parole officer about being involved in a fight, and that guns were used. Thus, the purpose defendant now argues would have been served by specifying the conviction was actually achieved by the cross-examination. The jury knew that Corbin was on parole and had to report the event immediately to his parole officer to avoid having parole revoked.

N.J.R.E. 609(a)(1) allows a conviction to be admitted for the purpose of impeaching a witness's credibility. Defendant does not provide us with any precedent establishing the sanitization of a conviction only applies to testifying defendants. The point lacks merit.

## III.

Defendant contends that the prosecutor's summation contained many prejudicial and improper statements. Despite many objections by defense counsel, the judge did not perceive a need to give a curative instruction. In our view, none of the objected-to comments were improperly prejudicial, nor did they warrant limiting or curative instructions.

For a prosecutor's comment to require a new trial, "there must have been 'some degree of possibility that [the prosecutor's comments] led to an unjust result.'" State v. McNeil-Thomas, 238 N.J. 256, 276 (2019) (alteration in original) (quoting State v. R.B., 183 N.J. 308, 330 (2005)). Moreover, that possibility of an unjust result must "be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." Ibid. (alteration in original) (quoting R.B., 183 N.J. at 330). Additionally, we consider "whether the offending remarks were prompted by comments in the summation of defense counsel." State v. Smith, 212 N.J. 365, 403-04 (2012).

"In determining whether the prosecutor's comments were sufficiently egregious to deny defendant a fair trial," an overall assessment is made of "the tenor of the trial and the responsiveness of counsel and the court to the

improprieties when they occurred." State v. Timmendequas, 161 N.J. 515, 575 (1999). The consideration includes "whether defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Id. at 576 (quoting State v. Ramseur, 106 N.J. 123, 322-23 (1987)).

Here, defendant first objects to the following passage from the State's summation:

> Now, you guys have been great listening [sic], and you've heard a lot of words. But I want to make sure that the intangible doesn't get lost on you. There weren't any slaps. There weren't any punches. There wasn't any pulling of hair.
>
> Katrell Trent put his finger on a trigger and sent a [.]25 caliber bullet piercing through Mr. Corbin's skin. That's how this fight began.
>
> Seconds after he was shot from behind, Terrell Corbin was picked up in the air and body slammed to the pavement. Not once, but twice.
>
> He was then dragged throughout the street, eventually knocked to the ground and then stomped over and over and over again. Yet despite all of that, Terrell Corbin was the lucky one.
>
> How much do you think Davon Gordon would give to have been shot once from behind as opposed to five or six times from above?

16

Defense counsel took particular issue with the last sentence we have quoted above, and objected because it was "inappropriate for counsel to describe anything out of the mouth of the victim," and asked that the judge instruct the jury to disregard that statement. The court sustained the objection.

We do not agree with defendant that this was a divisive and intentional remark intended to invoke sympathy from the jurors. It simply does not fall into the category of inflammatory statements that have required reversal in the past. See, e.g., State v. Blakney, 189 N.J. 88, 95-96 (2006) (holding the prosecutor's "personal feelings of outrage and revulsion" as to photographs of a child's injuries were unnecessarily inflammatory, where his summation included statements such as, "I could probably go on . . . but I can't look at these photos anymore. I just can't"). The prosecutor was merely countering defense counsel's suggestion during the closings that this was a fight between equally prepared combatants.

The prosecutor also made mention of Gordon having survived for seven hours after the shooting, which made him a "fighter." The defense objected as there had not been testimony to the effect that there were seven hours between the shooting and his death, characterizing this as another effort at evoking sympathy. The prosecutor explained he mentioned seven hours because the

17

shooting occurred at approximately 2:30 a.m., and the officer from the Prosecutor's Office was notified of the crime at 9:30 a.m. Additionally, the medical examiner had said that when Gordon arrived at the hospital, he had undergone unsuccessful medical procedures in order to attempt to save his life. Again, there was a basis for the prosecutor's comment, and it was not inflammatory.

During the trial and on appeal, defense counsel repeatedly objected to the prosecutor's summation on the basis that he was commenting on the videos when no one testified as to the particulars he was describing. The prosecutor did discuss the videos and details on the screen while showing the film to the jury. The court sustained defendant's objection that to identify folks on the film and talk about the directions in which they were moving in the absence of witness testimony was improper.

Reading the transcript, however, we conclude the prosecutor was doing nothing more than directing the jury's attention to aspects of the video he considered important. This was not a new identification of the actors, or in any way an improper interpretation of what was depicted. The prosecutor's comments did not stray from the evidence and legitimate inferences drawn from the evidence. See R.B., 183 N.J. at 330.

Defendant points to the prosecutor's comment that a co-defendant, Trent, defendant's brother, was purportedly seen throwing an object that looked like a gun, a comment also objected to at trial. The court sustained the objection. Nonetheless, it was a fair comment that when Trent threw something away, it was evidence he was attempting to discard, and a reasonable inference from the evidence to suggest it was a gun.

Defendant also claims that the prosecutor's theoretical question asking the jury what it would do if in Trent's shoes and innocent approaches improper comment on a defendant's exercise of his Fifth Amendment right. But the comment was fleeting. Certainly, it was not a reference to defendant's exercise of his Fifth Amendment right. In addition, the judge instructed the jury regarding a defendant's decision to not testify and that it could not consider that decision for any purpose. See Model Jury Charges (Criminal), "Defendant's Election Not to Testify" (rev. May 4, 2009). The statement did not create prejudicial error.

In closing, the prosecutor also showed slides made from the video including photographs, which were not provided in the record on appeal. One photograph depicted a person with the name Katrell Trent next to it, another with Kawon Robinson's name next to it. It is not clear what the other two

photographs showed.  Defense counsel objected that the parties had agreed that the pictures would not be shown—the prosecutor disputed this, stating that he understood that the names would be removed.  In any event, the individuals in the photos had been identified by both Tavin and Davis while they were on the witness stand.  Thus there is nothing about the jury seeing the photographs that in any way was improper.

All told, the prosecutor's summation does not warrant reversal. Furthermore, the trial judge's decision not to give curative instructions was not harmful error—sustaining the objections was enough.  Whether "a comment by counsel is prejudicial and whether a prejudicial remark can be neutralized through a curative instruction or undermines the fairness of a trial are matters 'peculiarly within the competence of the trial judge.'"  State v. Yough, 208 N.J. 385, 397 (2011) (quoting State v. Winter, 96 N.J. 640, 646-47 (1984)).  In this case, the judge's election was appropriate.  The judge's comprehensive and correct closing instruction, which tracked the model jury charges, sufficed to correct whatever minimal prejudice may have resulted from the closing statement.  There is no reason to believe the jury would not have followed the instructions given to them by the court.  See State v. T.J.M., 220 N.J. 220, 237 (2015).

IV.

Defendant raises three issues for the first time on appeal regarding alleged errors in the jury charges. In this case, the judge followed the model jury charges both as to murder and accomplice liability. The court did not charge the lesser-included of aggravated manslaughter. Counsel did not object to the charges. No proposed instructions were submitted by anyone.

"[A]ppropriate and proper charges to a jury are essential for a fair trial." State v. Maloney, 216 N.J. 91, 104 (2013) (quoting State v. Green, 86 N.J. 281, 287 (1981)). When "the subject matter is fundamental and essential or is substantially material," an inadequate jury charge "is almost always considered prejudicial." Id. at 104-05 (quoting Green, 86 N.J. at 291). Improper jury charges are "poor candidates for rehabilitation under the harmless error" standard. Id. at 105 (quoting State v. Simon, 79 N.J. 191, 206 (1979)). In those situations, a "'presumption of reversible error arises' that can only be excused if the error is determined to be 'harmless beyond a reasonable doubt.'" Ibid. (quoting State v. Collier, 90 N.J. 117, 123 (1982)).

Defendant suggests that the judge erred in giving the jury an accomplice liability charge because it does not apply to a street fight. His theory is that a street fight does not constitute evidence supporting the theory that defendants

were working in concert with each other. We note, however, that the video shown to the jury established that defendant and his co-defendants walked and gathered at an intersection after Corbin and Gordon drove by to park their car, almost immediately before the men began to fight.

Corbin identified defendant as initially in the street striking and kicking him. Statements made by the nearby resident and Davis, as well as Tavin in his initial interview statement with police, placed defendant in the midst of the group acting in concert and thus warrants the accomplice liability charge. The judge clearly explained to the jury that the accomplice liability charge was being given with reference to the aggravated assault of Corbin, not as to Gordon's murder. The judge was required to not only charge the jury as to the murder, but to accomplice liability as to the aggravated assault on Corbin, as the prosecution's theory was based on accomplice liability. See State v. Savage, 172 N.J. 374, 388 (2002). He did so, and it is not possible the jury would have confused the accomplice liability charge with the murder charge in light of the judge's explicit distinction.

"[B]ecause the trial court instructed the jury in accordance with relevant legal principles, [appellate courts can] presume that the jury understood and followed those instructions." Id. at 394. The jury did not ask a question to the

judge that would indicate otherwise.  Ibid.  Nothing in the record suggests the jury was confused as to which offense the accomplice instructions applied.

Defendant's point, although not included in a separate point heading, that the jury should have been charged with lesser-included offenses of murder is so lacking in merit as to not warrant much discussion in a written opinion.  R. 2:11-3(e)(2).  N.J.S.A. 2C:11-3(a) provides that "criminal homicide constitutes murder when:  [] (1) The actor purposely causes death or serious bodily injury resulting in death; or [] (2) The actor knowingly causes death or serious bodily injury resulting in death . . . ."  Thus, for serious bodily injury murder (SBI murder), the State needs to prove that a defendant "[(1)] knowingly or purposely inflicted serious bodily injury with actual knowledge that [(2)] the injury created a substantial risk of death, and that [(3)] it was 'highly probable' that death would result."  State v. Wilder, 193 N.J. 398, 409 (2008) (alterations in original) (quoting State v. Jenkins, 178 N.J. 347, 363 (2004)).

The Supreme Court has repeatedly outlined the differences between aggravated manslaughter and SBI murder.  Wilder, 193 N.J. at 409; Jenkins, 178 N.J. at 362-63; State v. Cruz, 163 N.J. 403, 417-18 (2000).  A defendant commits aggravated manslaughter when "recklessly caus[ing] death under circumstances manifesting extreme indifference to human life."  Wilder, 193 N.J. at 409

(alteration in original) (quoting N.J.S.A. 2C:11-4). Aggravated manslaughter differs in that it "does not require an intention to cause serious bodily injury or an awareness that death is 'practically certain' to follow." Ibid. (quoting Cruz, 163 N.J. at 417-18). The extreme indifference to human life determination focuses "not on the defendant's state of mind, but on the circumstances under which the defendant acted.'" Ibid. (quoting Cannel, N.J. Crim. Code Annotated, cmt. 2 on N.J.S.A. 2C:11-4 (2007)). Therefore, if a "defendant disregarded only a 'possibility' of death, the result is reckless manslaughter." Jenkins, 178 N.J. at 363.

That Gordon suffered five gunshot wounds to his abdomen and hip supported purposeful or knowing SBI murder. The number of bullets demonstrates the practical certainty of death. See Wilder, 193 N.J. at 409. The jury should not have been charged with a lesser-included offense.

V.

Finally, defendant argues that the cumulative effect of the errors requires a new trial. No errors were committed. Thus, there was no cumulative effect that impacted the fairness of the proceedings.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4682-18